**BEDFORD AFFILIATES, Plaintiff–Counter–Defendant–Appellee–Cross–Appellant,**

v.

**Richard SILLS, Defendant–Third–Party–Plaintiff–Appellant–Cross–Appellee,**

**Harvey Manheimer and Beverly Manheimer, Defendants–Cross–Defendants–Cross–Claimants–Counter–Claimants–Appellees,**

**D & L Cleaners of New York, Inc., Cross–Claimant–Counter–Claimant–Third–Party–Defendant.**

**Docket Nos. 97–9245, 97–9267.**

United States Court of Appeals, Second Circuit.

Argued May 15, 1998.

Decided Sept. 28, 1998.

Richard G. Leland, Rosenman & Colin LLP, New York, New York, for Appellant Richard Sills.

Robert G. Del Gadio, Uniondale, New York (Peter J. Tomao, Del Gadio & Tomao, Uniondale, New York, of counsel), for Appellee Bedford Affiliates.

Before: CARDAMONE, McLAUGHLIN, and JACOBS, Circuit Judges.

CARDAMONE, Circuit Judge:

Defendant Richard Sills appeals from a judgment, entered on August 6, 1997 in the United States District Court for the Eastern District of New York (Mishler, J.), holding him responsible under the Comprehensive Environmental Responses, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607(a), for costs incurred from the cleanup of discharges of a cleaning solvent used in the operation of his dry cleaning business. Sills also appeals from an order entered on September 17, 1997 in the same court, denying his motion for a new trial on the issue of the allocation of damages. Plaintiff Bedford Affiliates, the owner of the property where the dry cleaning store was located, cross-appeals from the August judgment that held it liable for part of the same cleanup costs and denied it recovery of attorney's fees. One of the questions plaintiff raises is whether it, as a party "innocent" of causing a hazardous spill, should completely escape liability for the costs of the cleanup. The answer is "no." To be innocent in a CERCLA response cost suit, one must be innocent in the eyes of the law. To be ignorant of the contaminated condition of one's property may be a generic form of innocence, but not the kind that will escape liability under the statute.

## BACKGROUND

### 1. *Facts*

This litigation arises from the environmental cleanup of real property located at 71 Forest Avenue, Glen Cove, New York (Site). Bedford Affiliates (Bedford), as the property owner, brought suit to recover cleanup costs from defendants Harvey and Beverly Manheimer (Manheimers) and Richard Sills (Sills), the tenants in possession. The following facts are gleaned from the bench trial held before Judge Mishler.

Bedford is a New York general partnership that purchased the Site on August 22, 1952 as vacant land and has held title ever since. Ten years after the purchase, Bedford agreed to lease the Site to Nassolk Construction Corp. (Nassolk) for 21 years, beginning May 1, 1962 and ending April 30, 1983 (May 1962 Nassolk Lease). The May 1962 Nassolk Lease further granted Nassolk an option to renew the lease for 21 more years.

Nassolk, as planned, constructed a retail dry cleaning store on the Site. The dry cleaning facility became operational in 1962. Nassolk immediately assigned its May 1962 Lease to the Manheimers' predecessors in interest. Under the terms of that lease, a lessee of the Site was obligated to maintain it properly, in compliance with state and federal laws, and return it to the lessor in good condition. On September 30, 1982 the Manheimers, as co-trustees of a trust that held the leasehold interest at that time, exercised the option to renew the May 1962 Nassolk Lease until April 30, 2004. The leasehold interest transferred to the Manheimers in February 1983 when the trust terminated.

From 1962 until 1973, the Site was subleased to at least four separate retail dry cleaning operators. On July 1, 1973 RonGlen Cleaners (RonGlen) subleased the property and operated the store until March 30, 1988. Defendant Richard Sills was RonGlen's sole officer, director and shareholder throughout the corporation's existence. Although he hired Richard Quarterman to manage limited aspects of the store's daily business, Sills continued to manage and maintain significant control over the store's operations.

Tetrachloroethylene, commonly known as "perc," is a widely used dry cleaning solvent. It is also a hazardous substance as that term is defined under CERCLA, 42 U.S.C. § 9601(14) (1994). The district court found that three releases of perc occurred at the Site during RonGlen's tenancy. The first was evidenced by a letter received by Quarterman from the Nassau County Department of Health dated November 30, 1978. The letter expressed concern regarding leakage of perc through a dryer hose from the back of the building. Quarterman delivered the letter to Sills, who told him to remove the hose and "[t]ake anything that is dripping outside, bring it inside and run it to the city drain." Quarterman complied by laying down copper tubing to run the perc directly into the city drain. Neither Sills nor Quarterman reported this incident to anyone.

A second incident occurred when the handle of a dry cleaning machine broke, causing 25 gallons of perc to spill onto the floor and flow into a dirt trench. Quarterman had the contaminated soil removed and put into a dumpster. Quarterman and Sills did not report this incident to anyone either. A third incident arose when a faulty door gasket caused a dry cleaning machine to drip. RonGlen continued to operate the machine for two days until a new gasket was obtained to replace the defective one.

Because no one at RonGlen disclosed these incidents, Bedford did not learn of the contamination until September 1990—after RonGlen had vacated the premises and assigned its sublease to D & L Cleaners of New York (D & L)—when it hired Richard D. Galli, an environmental consultant, to investigate the pollution potential from the operation of the dry cleaning business. Galli reported that the soil and groundwater at the Site tested positive for perc, and made several recommendations, including notifying the County Health Department. After Galli performed additional sampling, he issued a second report in November 1990, which recommended terminating all unpermitted discharges immediately and implementing a plan for the removal of contaminated soil. Galli again advised Bedford to contact the County Health Department.

Instead of immediately contacting the county agency, Bedford sent a letter by counsel to the Manheimers on December 3, 1990. The letter notified the Manheimers of the unlawful contamination at the Site—a material breach of the May 1962 Nassolk Lease—and demanded they remedy the situation or risk eviction. Over a year passed before Bedford's attorneys sent two more letters of similar import to both the Manheimers and their current dry cleaning tenant, D & L, on January 30, 1992 and June 24, 1992. Although these demands to cure were ignored, the Manheimers continued to pay Bedford monthly rent for the Site.

Because of the contaminated condition of the Site, Bedford terminated the May 1962 Nassolk Lease by letter dated July 7, 1992. It subsequently commenced a holdover proceeding in state court on July 29, 1992 to recover possession of the premises. Bedford, the Manheimers and D & L eventually reached a stipulation of settlement on October 30, 1992 that terminated the May 1962 Nassolk Lease between the Manheimers and Bedford and the sublease between the Manheimers and D & L. The settlement provided D & L would remain in possession of the Site and pay directly to Bedford a "use and occupancy" fee until a direct lease was negotiated with Bedford, or until D & L vacated the Site. Bedford agreed to avoid undue interference with D & L's business during Bedford's on-going investigation at the Site.

With D & L remaining as a tenant at the Site, Bedford, through its attorney, initiated negotiations with the New York State Department of Environmental Conservation (DEC). On October 12, 1993 those negotiations culminated in a consent order, pursuant to which Bedford agreed to begin cleanup procedures by submitting and implementing a Preliminary Site Assessment (PSA) work plan. Since the plan required that the premises be vacant, Bedford brought an action in state court to evict D & L. D & L vacated the Site on December 15, 1993 pursuant to a stipulation of settlement dated September 21, 1993.

Meanwhile, Bedford retained Tyree Brothers Environmental Services, Inc. (Tyree) as its environmental contractor. Tyree pre-

pared a PSA work plan, which the DEC approved on July 5, 1994. The plan was not subject to public comment. Tyree implemented the plan from May 1994 through January 1995, excavating significant amounts of soil in an unsuccessful attempt to locate a clean point that showed no contamination above DEC guideline levels. What these efforts did reveal was that substantial contamination had migrated outward from the initial releases of perc. Soil taken from the Site tested for the presence of perc in the amount of 170 parts per million, exceeding the DEC standard of less than one part per million. After removing the soil, Tyree took soil borings and installed a monitoring well. These borings samples showed contamination as well, and the PSA findings were reported by the contractor to Bedford and the DEC. The DEC responded by classifying the Site on its April 1996 registry as a "significant threat to the public health or environment" and called for action to be taken.

Ordinarily, the next step in the cleanup process would be a remedial investigation/feasibility study, which typically involves the development of a citizen participation program before the election of a final remedy. *See* N.Y. Comp.Codes R. & Regs. tit. 6, § 375–1.5(b) (1997). In this case, however, Bedford and the DEC entered into a second consent order on February 24, 1995. Pursuant to this order, Bedford agreed to submit and implement an interim remedial measure (IRM) work plan so that immediate remedial action could be taken at the Site to treat the contaminated soil and eliminate the source of further groundwater contamination. New York State regulations do not require public comment prior to implementing an IRM. *See id.* tit. 6, § 375–1.5(f).

Tyree once again prepared the IRM work plan on behalf of Bedford. The plan called for use of a soil vapor extraction system. This system removes contaminants from the soil by connecting piping in the ground to a regenerative blower. The blower creates a vacuum and pulls air from the soil along with the contamination to the surface, where it is ultimately discharged after being cleaned through activated carbon filters. The DEC approved the plan again without the opportu-

nity for public comment. The contractor began implementing the IRM in July 1995. Under the supervision of the DEC, the soil vapor extraction system has been operational since August 1996. Once this interim remedial measure is completed, public comment will be solicited regarding a remedial investigation/feasibility study or the completion of remediation if no further action is needed. *See id.* tit. 6, §§ 375–1.5(b) & 375–1.11(a).

### 2. *Prior Proceedings*

Bedford has incurred and will continue to incur substantial expenses as a result of the foregoing activities. These expenses include the costs for the engineering and contracting work performed by Tyree and Galli, the oversight costs charged by the DEC, and legal fees. As a result of these heavy financial obligations, Bedford commenced the present action in federal court on January 11, 1995. In its complaint it sought (1) to recover these costs from the Manheimers and Sills under CERCLA § 107(a), 42 U.S.C. § 9607(a), and/or (2) to obtain contribution from the Manheimers and Sills under CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1). Plaintiff further sought a declaratory judgment on liability for future costs pursuant to CERCLA §§ 107 and 113. In addition to its CERCLA claims, Bedford asserted several state law claims against the Manheimers and Sills, including claims for restitution and indemnification. The Manheimers responded by filing a cross-claim against Sills for contractual indemnification.

Following the bench trial, Judge Mishler rendered a Memorandum of Decision and Order dated August 6, 1997, in which he concluded that while Bedford could not pursue a cost recovery claim under CERCLA § 107(a), Bedford had established a claim for contribution under CERCLA § 113(f)(1). As to Bedford's state law restitution and indemnification claims, the district court concluded they were academic since CERCLA covers whatever damages Bedford is entitled to, and that amount may not be increased by additional causes of action. Accordingly, Judge Mishler proceeded to apportion liability for remediation costs under CERCLA § 113(f)(1).

The trial court found that Sills was the actual polluter at fault for the contamination of the Site and, as such, was responsible for 95 percent of Bedford's response costs. Although neither party actively contributed to the Site's contamination, Bedford was imputed five percent liability as the owner of the Site and the Manheimers were imputed five percent liability for their role as lessee/sublessor, the latter's liability to take effect only if Bedford was unable to collect the entire amount owed by Sills. Moreover, in the event the Manheimers were forced to reimburse Bedford for their share of response costs, Judge Mishler ruled in their favor on their cross-claim against Sills, entitling them to indemnification.

The district court next considered which expenses incurred by Bedford qualified as necessary response costs and thereby could be recovered under CERCLA. *See* 42 U.S.C. § 9607(a)(4)(B). It determined Bedford could recoup the fees paid to Tyree, Galli and the DEC in connection with response actions at the Site. However, the court turned down the recovery of any legal fees, including those arising from Bedford's efforts to regain possession of the Site prior to the cleanup. The trial court accordingly awarded Bedford $338,413.59 against Sills and $17,811.25 against the Manheimers for costs it had incurred, including pre-judgment interest. With respect to future response costs, Judge Mishler awarded Bedford declaratory relief according to the aforementioned 95–5–5 split for costs incurred following the conclusion of trial.

Judgment was entered on August 6, 1997. Pursuant to Fed.R.Civ.P. 59(a), Sills moved for a new trial solely on the issue of the allocation of past and future damages. The district court denied this motion in an order entered on September 17, 1997.

### 3. *The Present Appeal*

Sills urges on appeal that the district court erred when it: (a) found that Bedford made out a *prima facie* claim under CERCLA § 113(f)(1); (b) apportioned liability under CERCLA § 113(f)(1); and (c) granted the Manheimers' cross-claim for contractual indemnification without first piercing the cor-

porate veil of RonGlen. Bedford filed a cross-appeal asserting it was error to: (a) prevent it from pursuing a cost recovery action under CERCLA § 107(a); (b) deny recovery of 100 percent of its response costs under CERCLA § 113(f)(1); and (c) deny recovery of legal fees in connection with the state court actions necessary to obtain possession of the Site to begin the cleanup.

We discuss all of these issues in a fashion we think most logical in the context of this case. We analyze in Part I whether Bedford may proceed under CERCLA § 107(a) to recoup its losses. Next, we discuss in Part II whether Bedford made out a *prima facie* case under CERCLA § 113(f)(1). Since both parties fault the apportionment percentages, our analysis in Part III determines whether liability was properly apportioned under § 113(f)(1). Our discussion concludes by analyzing Bedford's argument regarding its entitlement to legal fees in Part IV and Sills' challenge to the district court's granting the Manheimers' cross-claim for indemnification, without first piercing the corporate veil, in Part V.

## DISCUSSION

### I Relationship Between CERCLA § 107(a) and § 113(f)(1)

A. *An Action Is Not Available Under § 107(a) for a Potentially Responsible Party*

CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), provides two legal avenues by which a private party can recoup some or all of the costs associated with an environmental cleanup: a cost recovery action under § 107(a) and a contribution action under § 113(f)(1). Bedford sued Sills and the Manheimers under both theories. To decide whether Bedford may recover under both CERCLA provisions, we must clarify the relationship between them.

■ The original CERCLA legislation enacted in 1980 created the cost recovery scheme under § 107(a). *See* Comprehensive Environmental Responses, Compensation, and Liability Act of 1980, Pub.L. No. 96–510,

§ 107(a), 94 Stat. 2767, 2781 (codified as amended at 42 U.S.C. § 9607(a)). Congress established four classes of "potentially responsible persons," including: (1) present owners and operators of facilities that accepted hazardous substances; (2) past owners and operators of such facilities; (3) generators of hazardous substances; and (4) certain transporters of hazardous substances. *See* CERCLA § 107(a), 42 U.S.C. § 9607(a); *see also B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998). Potentially responsible persons are held strictly liable for, among others, necessary cleanup costs "incurred by any other person consistent with the national contingency plan." CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B); *see also Betkoski,* 99 F.3d at 514; *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985). Where the environmental harm is indivisible, multiple responsible persons will be jointly and severally liable for cleanup costs. *See B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992).

■ In its original form, CERCLA lacked a specific provision permitting a potentially responsible person that had incurred cleanup costs to seek contribution from other liable parties. Numerous district courts, in response, interpreted CERCLA § 107(a) to imply such a cause of action. *See Key Tronic Corp. v. United States,* 511 U.S. 809, 816, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). With the 1986 enactment of SARA, Congress added CERCLA § 113(f)(1) as an express authorization of claims for contribution. *See* Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, § 113(f), 100 Stat. 1613, 1647 (codified as amended at 42 U.S.C. § 9613(f)(1)). CERCLA § 113(f)(1) states "[a]ny person may seek contribution from any other person who is liable or potentially liable under [CERCLA § 107(a) ]" for response costs. 42 U.S.C. § 9613(f)(1). To resolve § 113(f)(1) contribution claims, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Id.*

■ The district court in the present case properly held that Bedford could not pursue

a § 107(a) cost recovery claim against Sills and the Manheimers due to its status as a potentially responsible person. Section 107(a) holds a potentially responsible person liable for costs incurred by "any other person" during an environmental cleanup. As noted earlier, where multiple parties are responsible, joint and several liability attaches. Consequently, one potentially responsible person can never recover 100 percent of the response costs from others similarly situated since it is a joint tortfeasor—and not an innocent party—that ultimately must bear its *pro rata* share of cleanup costs under § 107(a).

To bring a derivative action to recoup the portion of costs exceeding a potentially responsible person's equitable share of the overall liability, however, is a quintessential claim for contribution, where a party seeks to apportion liability for an injury for which it is also directly liable. *See Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994) (referring to a contribution claim as one "by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make"); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 204, 207 (2d Cir.1987) ("Contribution is the proportionate sharing of liability among tortfeasors.") (citing *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227, 240 n. 12 (2d Cir.1967)); Restatement (Second) of Torts § 886A (1979).

CERCLA § 113(f) plainly governs such contribution actions. *See* 42 U.S.C. § 9613(f)(1) (permitting "any person" to seek contribution from "any other person" potentially liable under CERCLA § 107); *see also* H.R.Rep. No. 99–253(I), at 79 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2861 (enunciating that a principal goal in passing CERCLA § 113 was to "clarif[y] and confirm[ ] the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.").

Our decision today to limit the recovery of a potentially responsible person to contribu-

tion under § 113(f) not only is in keeping with the holdings of other Circuits, *see Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co.*, 142 F.3d 769, 776 (4th Cir.1998); *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1120 (3d Cir. 1997); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996); *United States v. Colorado & Eastern R. Co.*, 50 F.3d 1530, 1536 (10th Cir.1995); *United Technologies Corp. v. Browning-Ferris Industries, Inc.*, 33 F.3d 96, 100 (1st Cir.1994); *Akzo Coatings*, 30 F.3d at 764, but also gives CERCLA its full intended effect. In contrast to § 113(f)(1), which apportions liability based on equitable considerations and has a three-year statute of limitations, *see* 42 U.S.C. § 9613(g)(3), § 107(a) has a six-year statute of limitations, *see* 42 U.S.C. § 9613(g)(2). Were we to permit a potentially responsible person to elect recovery under either § 107(a) or § 113(f)(1), § 113(f)(1) would be rendered meaningless. *See New Castle*, 111 F.3d at 1122–23; *United Technologies*, 33 F.3d at 100–01. A recovering liable party would readily abandon a § 113(f)(1) suit in favor of the substantially more generous provisions of § 107(a).

We decline to interpret § 107(a) so broadly that § 113(f)(1) would become a nullity. *See Shore Realty*, 759 F.2d at 1044 ("Without a clear congressional command otherwise, we will not construe a statute in any way that makes some of its provisions surplusage."). The language of CERCLA suggests Congress planned that an innocent party be able to sue for full recovery of its costs, *i.e.*, indemnity under § 107(a), while a party that is itself liable may recover only those costs exceeding its *pro rata* share of the entire cleanup expenditure, *i.e.*, contribution under § 113(f)(1).

### B. May Bedford Proceed With a § 107(a) Action As an Innocent Owner?

The district court held Bedford liable for five percent of its response costs due to its past and present ownership of the Site. This holding has a sound basis in the statute. *See* CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2) (defining a potentially responsible person to include "any person who at the

time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of"); *see also* CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1) (imposing strict liability on present owners of facilities). Nevertheless, Bedford stresses it did not actually cause the contamination at the Site and therefore concludes we should permit it to proceed with its § 107(a) cost recovery claim. *Cf. Rumpke of Indiana, Inc. v. Cummins Engine Co.,* 107 F.3d 1235, 1241 (7th Cir.1997) ("We conclude instead that landowners who allege that they did not pollute the site in any way may sue for their direct response costs under § 107(a)."). We are unpersuaded by Bedford's argument.

CERCLA § 107(a) imposes strict liability without regard to causation on parties who fall within at least one of the four categories of potentially responsible persons. We have reinforced that concept of strict liability. *See United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721 (2d Cir.1993) ("What is *not* required is that ... a specific defendant's waste caused incurrence of clean-up costs."); *Shore Realty,* 759 F.2d at 1043–45 (refusing to read a causation requirement into § 107 because Congress declined to do so).

To mitigate the harsh effect strict liability often imposes, Congress created statutory affirmative defenses for parties, such as Bedford, which would otherwise be liable under CERCLA § 107(a). *See* CERCLA § 107(b), 42 U.S.C. § 9607(b). Each defense carves out from liability an exception based on causation. *See Shore Realty,* 759 F.2d at 1044. For example, a facility owner can escape liability by proving that the release or threatened release was caused solely by an act or omission of a third party. *See* CERCLA § 107(b)(3), 42 U.S.C. § 9607(b)(3); *cf. Akzo Coatings, Inc.,* 30 F.3d at 764 ("Yet, Akzo has experienced no injury of the kind that would typically give rise to a direct claim under section 107(a)—it is not, for example, a landowner forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands."). But this defense is unavailable if the third party had a direct or indirect contractual relationship with the owner, and the contamination occurred in the course of that relationship. *See* CERCLA § 107(b)(3), 42 U.S.C. § 9607(b)(3).

In the present case, Bedford clearly shared a contractual relationship with Sills, who subleased the Site. *See* 42 U.S.C. § 9601(35)(A) ("The term 'contractual relationship' ... includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession...."). Moreover, the contamination occurred during that sublease, when Sills operated the dry cleaning store and spilled perc onto the property on three separate occasions. Although "innocent landowners" who acquire a site without actual or constructive knowledge of pre-existing hazardous conditions are not deemed liable under CERCLA by virtue of a "contractual relationship," *see id.,* Bedford acquired the Site before a dry cleaning facility was built there, and hence long before the hazardous conditions arose.

Unable to avail itself of any statutory defense, Bedford asks us to recognize a broader defense for all landowners who do not contribute actively to the contamination, regardless of their privity with the polluter, the manner in which they acquired the property, and their expectations as to its use. We decline to do so because adopting Bedford's argument would carve out judicially an additional defense that Congress itself chose not to create.

Moreover, this broader exception would make superfluous the more restrictive defenses already provided in § 107(b). *See Shore Realty,* 759 F.2d at 1044. Accordingly, we hold that a potentially responsible person under § 107(a) that is not entitled to any of the defenses enumerated under § 107(b)—like Bedford—cannot maintain a § 107(a) action against another potentially responsible person. *See New Castle County,* 111 F.3d at 1124. Bedford instead must rely on a claim for contribution provided for in CERCLA § 113(f)(1).

### C. *State Law Restitution and Indemnification*

A question remains as to whether CERCLA § 113(f) preempts Bedford's state law restitution and indemnification claims.

After finding that Bedford had alleged facially valid causes of action for such common law relief, the district court ruled that since the damages to which Bedford is entitled are governed by CERCLA and are not increased by additional causes of action or by alternative or creative theories of liability, whether the state common law claims may be asserted in light of CERCLA is academic. The district court further noted that the Third Circuit in *In re Reading Co.*, 115 F.3d 1111, 1116 (3d Cir.1997), had stated that CERCLA § 113(f) preempted state law remedies; but it did not address this issue because it had already determined that regardless of whether state law claims were preempted or not damages would be unaffected. We believe the issue should be addressed and turn to it now.

Under the Supremacy Clause of article VI, Congress may enact laws that preempt state or local law. There are at least three ways in which preemption of local law may be accomplished. *See, e.g., Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Com'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). First, Congress may in express terms declare its intention to preclude state regulation in a given area. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Second, preemption may be implied when federal law is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough*, 471 U.S. at 713, 105 S.Ct. 2371 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Third, state law may be preempted "to the extent that it actually conflicts with a valid federal statute." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). Conflict preemption occurs either when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132,

142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). Of course, "courts should not lightly infer" that state or local law has been preempted by federal law. *International Paper Co. v. Ouellette*, 479 U.S. 481, 490, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987); *see also Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 500, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988). The Third Circuit's holding that CERCLA preempts state restitution and indemnification remedies was predicated on the rationale that there is an actual conflict between CERCLA § 113(f) and state law remedies. *See In re Reading Co.*, 115 F.3d at 1117.

We have ruled that CERCLA as a whole does not expressly preempt state law, but simply prohibits states from " 'recovering compensation for the same removal costs or damages or claims' under both CERCLA and state or other federal laws, and prohibits states from requiring contributions to any fund 'the purpose of which is to pay compensation for claims which may be compensated under' CERCLA." *Shore Realty*, 759 F.2d at 1041 (citing 42 U.S.C. § 9614(a)-(c)). Support for the view that CERCLA does not preempt state law across the board may be gleaned from the repeal of CERCLA § 114(c). An accompanying Senate report stated

> The reported bill strikes section 114(c) of the Act to clarify that States are not preempted from imposing taxes for purposes already covered by CERCLA ... The primary effect of the amendment will be to remove a potential barrier to the creation of State superfund programs.

S.Rep. No. 11, 99th Cong., 1st Sess. at 59–60 (1985); *see Manor Care, Inc. v. Yaskin*, 950 F.2d 122, 125–26 (3d Cir.1991). We conclude it was not part of the legislative purpose that CERCLA be a comprehensive regulatory scheme occupying the entire field of hazardous wastes, nor does CERCLA prevent the states from enacting laws to supplement fed-

eral measures relating to the cleanup of such wastes.

In enacting § 113(f) as part of SARA—an Act that expressly created a statutory right of contribution—Congress created a statutory settlement scheme. The scheme was put in place to aid the expeditious resolution of environmental claims. To accomplish this objective Congress employed incentives for potentially responsible parties to settle and strong disincentives for non-settling potentially responsible parties. Thus, potentially responsible parties who choose to settle are granted protection from contribution actions being asserted against them under § 113(f)(2), but retain the right to bring contribution actions against other non-settling parties. *See* CERCLA § 113(f)(3)(B). The statute further provides that the amount recoverable from the remaining non-settling parties is reduced only by the amount of the settlement. *See* CERCLA § 113(f)(2). Hence, potentially responsible parties who choose to settle gain protection from contribution, enjoy potentially favorable settlement terms, and retain the ability to seek contribution from other defendants. Those responsible parties who choose not to settle are barred from seeking contribution from the settling parties and thereby face potentially disproportionate liability. *See In re Reading Co.*, 115 F.3d at 1119.

As a result, it can easily be seen that instituting common law restitution and indemnification actions in state court would bypass this carefully crafted settlement system, creating an actual conflict therefore between CERCLA and state common law causes of action. Consequently, CERCLA preempts the state law remedies of restitution and indemnification.

## II *Prima Facie* Case Under CERCLA § 113(f)(1)

■ Turning to CERCLA § 113(f)(1), Sills contends that Bedford is not entitled to recover because it failed to establish a *prima facie* cause of action. The elements of an action under § 113(f)(1) are the same as those under § 107(a). *See* CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1) ("Any person may seek contribution from any other

person who is liable or potentially liable under [CERCLA § 107(a) ]."). Hence, to establish a *prima facie* cause of action for contribution, a private party must show

(1) Defendant fits within one of the four classes of responsible parties outlined in § 107(a).

(2) The site is a facility.

(3) There is a release or threatened release of hazardous substances at the facility.

(4) The plaintiff incurred costs responding to the release or threatened release.

(5) The costs and response actions conform to the National Oil and Hazardous Substances Pollution Contingency Plan (National Plan).

*See Betkoski*, 99 F.3d at 514; *Murtha*, 958 F.2d at 1198. Sills maintains that Bedford's remediation plan was inconsistent with the National Plan because, although approved by the DEC, public comment was not solicited.

■ The Environmental Protection Agency (EPA) in 1990 revised the National Plan and its provisions for determining the consistency of private party response actions. *See* National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed.Reg. 8666 (Mar. 8, 1990) (National Plan). In so doing, the EPA reduced the standard for compliance from strict to substantial compliance. *See id.* at 8793; 40 C.F.R. § 300.700(c)(3)(i) (1997). As a result, an "immaterial or insubstantial" deviation from the National Plan will no longer cause the cleanup to be deemed inconsistent. 40 C.F.R. § 300.700(c)(4). The issue of substantial compliance is a mixed question of law and fact, which we review *de novo. See Louisiana–Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1576 (9th Cir.1994).

■ The 1990 National Plan sets out a variety of provisions that parties undertaking private cleanups should follow. *See* 40 C.F.R. § 300.700(c)(5)-(7). Among those provisions is one calling for an opportunity for public comment concerning the selection of a response action

Private parties undertaking response actions should provide an opportunity for public comment concerning the selection of

the response action based on the provisions set out below, or based on substantially equivalent state and local requirements. *Id.* § 300.700(c)(6). "Public participation is an important component of a CERCLA-quality cleanup, and of consistency with the [National Plan]." National Plan, 55 Fed.Reg. at 8795. Sills urges that Bedford's failure to provide any opportunity for public comment prior to initiating cleanup at the Site should preclude recovery of response costs. *See County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1514–15 (10th Cir.1991) (per curiam) (finding a response action inconsistent with the National Plan because no opportunity for public comment was provided).

When the EPA amended the National Plan in 1990, it sought to encourage private parties to perform voluntary environmental cleanups by removing unnecessary obstacles to their ability to recover cleanup costs. *See* National Plan, 55 Fed.Reg. at 8792–93; *see also Betkoski,* 99 F.3d at 514 ("As a remedial statute, CERCLA should be construed liberally to give effect to its purposes. . . . These include facilitating efficient responses to environmental harm."). The EPA expressly recognized the pitfalls of requiring private parties to adhere to a detailed set of mechanical rules: "[P]roviding a list of rigid requirements may serve to defeat cost recovery for meritorious cleanup actions based on a mere technical failure by the private party that has taken the responsive action." National Plan, 55 Fed.Reg. at 8793. Thus, the EPA abandoned its former ritualistic rule in favor of a case-by-case balancing approach that would evaluate the cleanup effort as a whole to ensure the quality of the cleanup while removing undue procedural obstacles to National Plan consistency.

Under this standard for measuring compliance, the public comment provision functions as an important concern, but not an inflexible requirement. *See id.* (explaining that provisions set forth in §§ 300.700(c)(5)-(7) are provided as "*guidance* to private parties on those requirements that *may be pertinent* to a particular site.") (emphasis added). Even the plain language of the National Plan does not mandate public participation; it simply states that private parties "should" seek public comment. *See* 40 C.F.R. § 300.700(c)(6).

The 1990 revisions to the National Plan suggest that significant state involvement serves the identical purpose that the public notice provision seeks to effectuate. The EPA added the public notice provision because

> [t]he public—both [potentially responsible persons] and concerned citizens—have a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups—*which are performed without governmental supervision*—are carried out in an environmentally sound manner. Thus, EPA has decided that providing public participation opportunities should be a condition for cost recovery under CERCLA.

National Plan, 55 Fed.Reg. at 8795 (emphasis added). This language suggests that when the EPA inserted the public comment provision, it was troubled by private cleanups lacking significant governmental involvement. These concerns are mitigated—if not eliminated—where, as here, a state environmental agency is substantially involved in the formulation and execution of a preliminary remediation plan.

The district court found the DEC has been actively involved in the cleanup of this Site since 1993 when Bedford negotiated its first consent order. DEC officials periodically have been present to investigate the implementation of the preliminary site assessment and the interim remedial measure, and generally to oversee the progress of the cleanup and the soil vapor evacuation system. Such extensive involvement of a government agency charged with the protection of the public environmental interest is an effective substitute for public comment. Where a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive input, and the private parties involved act pursuant to those instructions, the state participation may fulfill the public participation requirement. *See American Color & Chem. Corp. v. Tenneco Polymers, Inc.,* 918 F.Supp. 945, 957 (D.S.C.1995); *General Elec. Co. v. Litton Business Systems, Inc.,* 715

F.Supp. 949, 961 (W.D.Mo.1989). Since, as Sills conceded at oral argument, none of the parties to the action disputes the quality or cost of Bedford's cleanup efforts, to preclude its recovery solely because of the lack of public comment would ignore the equitable component that Congress and the EPA built into cleanup costs decisions.

### III Apportionment of CERCLA Liability

While § 113(f)(1) directs courts to allocate cleanup costs between responsible parties "using such equitable factors as the court determines are appropriate," it does not limit courts to any particular list of factors. The statute's expansive language instead affords a district court broad discretion to balance the equities in the interests of justice. *See Environmental Transp. Systems, Inc. v. EN-SCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992) ("[T]he language of [CERCLA § 113(f)] clearly indicates Congress's intent to allow courts to determine what factors should be considered in their own discretion without requiring a court to consider any particular list of factors."); *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 571 (6th Cir.1991) ("The trial judge was well within the broad discretion afforded by the statute in making the apportionment he did.").

We will not overturn the district court's determination absent an abuse of that discretion. Here, that court performed a comparative culpability analysis focusing on several factors, including relative fault, to apportion contribution recovery. It found that all discharges of perc at the Site occurred during RonGlen's tenancy and apportioned responsibility as follows: Bedford—five percent; Sills—95 percent; and the Manheimers—five percent, in the event that Sills failed to pay his full share.

### A. *Sills' Position*

Sills insists the district court: failed to allocate liability to the parties that owned and operated the dry cleaning facility at the Site between 1962 and 1978; failed to allocate responsibility to D & L, a subsequent tenant at the Site, for a perc spill that allegedly occurred between 1988 and 1993; and understated Bedford's fault by allocating only five percent of the responsibility to the landowner. None of these arguments is convincing.

First, Sills believes the parties who operated the dry cleaning facility prior to Ron-Glen's tenancy should bear some responsibility for the cleanup costs. He contends that although the County Health Department discovered the perc leakage in 1978, the pipe that leaked perc out the back of the store was in place prior to RonGlen's arrival in 1973. In essence, Sills asks us to infer that if the pipe through which the leakage occurred was the same, then the previous tenants who used that pipe caused the same contamination. But Sills submitted no evidence to show that the pipe actually leaked perc prior to 1978 when he took possession of the Site. Hence, it was not error to find Sills solely responsible for that discharge.

Alternatively, Sills asserts that the broken gasket discharge occurred during a prior tenant's occupancy of the Site. Although Richard Quarterman testified on cross-examination that the broken gasket occurred before 1973, he testified on direct and re-direct examination that the gasket on the dry cleaning machine was replaced during the time that Sills operated the business. The district court's credibility finding that the latter testimony was accurate and that Sills was responsible for the gasket discharge was not clearly erroneous.

Second, Sills contends that D & L should not escape responsibility for cleanup at the Site. There is no proof in the record, however, demonstrating that D & L caused any contamination after RonGlen assigned its sublease on March 30, 1988. In fact, the record leads to the opposite conclusion. The October 1992 Settlement acknowledged that D & L installed "environmentally secure dry cleaning equipment" in 1988. This equipment prompted a dramatic reduction in perc consumption at the Site from approximately 2,500 gallons per year when Sills operated the store to 150 gallons per year when D & L took it over. Moreover, Quarterman, who remained as D & L's on-sight manager, testified that no perc spills occurred after Ron-Glen vacated the Site.

Third, although Sills naturally has a different view of the relative fault of Bedford than the district court, the allocation of costs under CERCLA is committed to the court's discretion. We find no abuse of that discretion in its determination that Sills' responsibility as an owner and operator, who was deeply involved in the daily operations of the waste-producing enterprise, far exceeded that of Bedford, an absentee landlord.

■ In addition to raising these three arguments as a basis for reversing the initial apportionment of liability at trial, Sills includes these same arguments as support for finding that the trial court erred by denying his Fed.R.Civ.P. 59(a) motion for a new trial on the issue of the allocation of damages. We reverse a district court's denial of a motion for a new trial only for an abuse of discretion. *See Dailey v. Societe Generale*, 108 F.3d 451, 458 (2d Cir.1997); *Ball v. Interoceanica Corp.*, 71 F.3d 73, 76 (2d Cir. 1995) (per curiam). For the reasons just discussed, we see no abuse of discretion arising from the denial of Sills' Rule 59(a) motion.

### B. *Bedford's Position*

■ In pursuing a claim for contribution under CERCLA § 113(f)(1), Bedford thinks it should recover 100 percent of its past and future response costs. It points out again that, unlike Sills, it did not contribute to the hazardous condition at the Site and urges us to consider its cooperation with the DEC in effectuating the cleanup. Support for this position can be found in SARA's legislative history. *See* H.R.Rep. No. 99–253(III), at 19 (1985), *reprinted in* 1986 U.S.C.C.A.N. 3038, 3042 ("Relevant criteria for the courts to use in deciding whether to grant apportionment may include . . . the degree of cooperation of the parties with government officials to prevent any harm to public health or the environment.").

Nevertheless, we find no abuse of discretion in the district court's decision to hold Bedford responsible for five percent of the contamination. Bedford faces CERCLA liability as a result of its status as a landowner throughout Sills' tenancy—the period of contamination. *See* CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2). Moreover, Bedford is not truly blameless for the Site's contaminated state. Upon learning that the Site was contaminated in 1990, plaintiff waited almost three years to hire Tyree and contact a government agency to begin cleanup. While this inaction is not tantamount to pollution, it serves as an independent basis for imposing some liability on Bedford. Had it acted quicker, the contamination might have been less. *See* H.R.Rep. No. 99–253(III), at 19 (1985), *reprinted in* 1986 U.S.C.C.A.N. 3038, 3042 (permitting courts to consider the degree of care exercised by the parties when apportioning liability).

### IV Attorney's Fees as Response Costs

■ Bedford seeks as response costs its attorney's fees incurred in connection with the actions it took to obtain possession of the Site. In *Key Tronic Corp.*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797, the Supreme Court considered whether attorney's fees are recoverable as necessary response costs under CERCLA. *See id.* at 811, 114 S.Ct. 1960. It held that private parties could not recover attorney's fees incurred in prosecuting a CERCLA cost recovery action

> Given our adherence to a general practice of not awarding fees to a prevailing party absent explicit statutory authority . . . we conclude that CERCLA § 107 does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action.

*Id.* at 819, 114 S.Ct. 1960. CERCLA also does not cover attorney's fees arising from negotiations between a private party and a government agency that culminate in a consent decree. *See id.* at 820, 114 S.Ct. 1960.

On the other hand, the Supreme Court did rule that attorney's fees for work performed in identifying potentially responsible persons were recoverable because the work "benefited the entire cleanup effort" and not just the private party's own interests. *Id.* Thus, the High Court left open the possibility that "some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself." *Id.* The key inquiry for courts to examine care-

fully is the exact type of legal services covered by the fee.

In the present case, the issue is whether the attorney's fees that Bedford incurred to regain possession of the Site and begin cleanup are so "closely tied to the actual cleanup" that those fees qualify as response costs. Unfortunately, the district court failed to make any finding on the matter. It determined that Bedford could not recoup these fees under state law, but neglected to consider whether it would reach the same result under CERCLA, reasoning only that fees paid in connection with prosecuting the present action and negotiating the consent orders are not recoverable under CERCLA. Consequently, on remand we direct the district court to decide whether the legal fees paid to regain possession of the Site are recoverable under CERCLA.

### V Cross-claim for Contractual Indemnification

The Manheimers filed a cross-claim against Sills for contractual indemnification. When RonGlen entered into its sublease in 1973, it became obligated to comply with the appropriate environmental regulations, prevent contamination at the Site and "forever indemnify and save harmless [the Manheimers] for and against any and all liability, penalties, damages, expenses and judgments arising from injury … [to the Site], occasioned wholly or in part by [RonGlen]." Pursuant to the indemnity provision, the court held Sills personally liable for any amounts the Manheimers would be required to pay Bedford.

■ A court may hold certain individuals, such as Sills, personally liable under CERCLA for acts of his or her corporation without performing traditional veil-piercing analysis. *See Shore Realty,* 759 F.2d at 1052 ("[A]n owning stockholder who manages the corporation … is liable under CERCLA as an 'owner or operator.' "). However, to hold the same individual personally liable under New York common law, the court must first pierce the corporate veil. *See, e.g., Walkovszky v. Carlton,* 18 N.Y.2d 414, 417, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966); *Bartle v. Home Owners Co-op,* 309 N.Y. 103, 106, 127

N.E.2d 832 (1955). Since the district court imposed personal liability on Sills pursuant to the Manheimers' state contractual indemnification claim, it was required to perform the requisite piercing.

■ To pierce the corporate veil in this case, the district court must find that: (1) Sills exercised domination and control over RonGlen; and (2) this control was used to cause a wrong to the Manheimers. *See American Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997) (applying New York law); *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 138 (2d Cir.1991) (explaining that under New York law, the use of control to commit a wrong causing loss to a party is key to piercing the corporate veil); *Morris v. New York State Dep't of Taxation & Fin.,* 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993).

■ Sills alleges the district court failed to find the facts necessary to support veil piercing. We agree. As to the first element, we accept the district court's finding that Sills' domination and control over RonGlen was well-established based upon his ownership of all of the shares of stock of RonGlen Cleaners, his position as sole officer and director, and his participation in the day-to-day activities of RonGlen Cleaners. However, the trial court made no findings on the second element of the veil piercing analysis—namely that Sills' domination led to the Site's contamination, *i.e.,* his control was used to commit a wrong that resulted in contamination at the Site and a breach of the sublease. Mere domination or control of the corporation is insufficient to permit a court to disregard the existence of the corporate entity. *See Thrift Drug, Inc. v. Universal Prescription Adm'rs.,* 131 F.3d 95, 98 (2d Cir.1997) (per curiam) (remanding for a determination on the second *American Fuel* element); *Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1053 (2d Cir.1997) ("[T]he element of domination and control never was considered to be sufficient of itself to justify the piercing of a corporate veil.").

Although substantial evidence exists that shows Sills was directly involved in orches-

trating the cleanup of the perc spills and decided against informing the appropriate regulatory agencies of those spills, a finding that Sills' corporate domination caused the contamination at the Site must be made in the first instance by the district court before veil-piercing can occur. *See Freeman*, 119 F.3d at 1053. As a consequence, the award of contractual indemnification must be vacated and this matter also remanded to the district court to determine whether the second element for veil-piercing purposes was met. *See Thrift Drug*, 131 F.3d at 98; *Freeman*, 119 F.3d at 1053.

## CONCLUSION

For the reasons stated, we affirm the judgment to the extent it foreclosed Bedford from pursuing a CERCLA § 107(a) claim and determined that Bedford established a *prima facie* CERCLA § 113(f)(1) claim. We also affirm the judgment with respect to its allocation of responsibility for past and future cleanup costs at the Site, in addition to affirming the district court's denial of Sills' motion for a new trial pertaining to this issue. Insofar as the judgment denied recovery to Bedford for its attorney's fees incurred in connection with regaining possession of the Site, and insofar as the judgment held Sills personally liable on the Manheimers' cross-claim for contractual indemnification, we vacate and remand those issues for further consideration consistent with this opinion.

Affirmed in part, vacated and remanded, in part.