UNITED STATES of America,
Plaintiff,

v.

175 INWOOD ASSOCIATES LLP, 175
Roger Corp., Abraham Woldiger,
Abraham Taub, Peter Hoffman (Pin-
chas), Defendants.

No. 96–CV–1471DRHETB.

United States District Court,
E.D. New York.

Aug. 6, 2004.

United States Attorney's Office for the Eastern District of New York by Kevin P. Mulry, Esq., Stanley Alpert, Esq., Central Islip, NY, for Plaintiff.

Joel Kenneth Dranove, Esq., New York City, for Defendants.

### MEMORANDUM & ORDER

HURLEY, District Judge.

This is a civil action brought pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601, *et seq.* Section 107(a) of CERCLA allows the United States to move rapidly to respond to the release or threatened release of hazardous substances by permitting the government to spend monies from a "Superfund" established by Congress to finance the initial cost of such response actions. In relevant part, the United States brings this action against 175 Inwood Associates, 175 Roger Corporation, Abraham Woldiger, Abraham Taub, and Peter (Pinchas) Hoffman ("Defendants") based on their liability under CERCLA. The United States seeks to

recover costs incurred by the Environmental Protection Agency ("EPA") in response to the release or threat of release of hazardous substances at 175 Roger Avenue, Inwood, New York ("Inwood Site" or the "Site"). The United States also seeks to recover civil damages from the Defendants for failure to comply with (1) an Administrative Order issued by the EPA pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a); (2) an Access Order issued by the EPA pursuant to Sections 104(e)(3) and (e)(5) of CERCLA, 42 U.S.C. § 9604(e)(3) and (e)(5); and (3) multiple Requests for Information issued by the EPA pursuant to Section 104(e)(2) of CERCLA, 42 U.S.C. § 9604(e)(2).

The Complaint was filed on March 26, 1996. This case received a non-jury trial before the undersigned on November 6, 2003. The parties submitted proposed findings of fact and conclusions of law after the trial. All such post-trial submissions, including the Defendants' reply and the government's sur-reply, were received in chambers by March 10, 2004.

This decision serves to provide the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## I. UNDISPUTED FACTS.

The following undisputed facts were set forth in the Pretrial Order Statement of Stipulated Facts filed June 29, 1999 ("Pretrial Order"), the evidence received in connection with the November 6, 2003 non-jury trial, and the proposed findings of fact submitted by both parties after the trial. The Court will identify several remaining disputed facts while recounting the undisputed facts. These identified disputed facts will be discussed later in the instant order.

175 Inwood Associates is a limited liability partnership under New York Partnership law. Plaintiff's Exhibit ("Pl.'s Ex.") 84. The partnership was established for the express purpose of buying property at the Inwood Site, which contained a commercial building. Pl.'s Ex. 84; Transcript of trial dated November 6, 2003 ("Tr.") 93. Under the original partnership agreement, executed in November 1988, Abraham Woldiger and Peter Hoffman were designated as general partners, and Abraham Taub was designated as the sole limited partner. Pl.'s Ex. 84; Defendants' Exhibit ("Defs.' Ex.") K. In order to finance the purchase of the Inwood Site, interests in the partnership were assigned to various investors who became limited partners. Defs.' Ex. K. In early 1989, Woldiger, Taub, and Hoffman executed an amended partnership agreement that named all three as general partners of 175 Inwood Associates. Defs.' Ex. K; Tr. 93. Currently, 175 Inwood Associates has no assets. Tr. 102, 115–16. The question of whether liability attaches individually to Woldiger, Taub, and Hoffman as general partners of 175 Inwood Associates is governed by New York Partnership law and will be addressed in Part II of this Order.

In January 1989, 175 Inwood Associates purchased the Inwood Site, subject to a $3.63 million mortgage held by Citytrust. Pretrial Order ¶ 1. Prior to agreeing to a contract of sale for the property, and in order to protect that entity's security interest in the Inwood Site, Citytrust required that Hoffman be a general partner of 175 Inwood Associates as discussed *supra.* Tr. 78. In addition, Woldiger and Hoffman also gave personal guarantees to Citytrust in order to complete the transaction. Tr. 77, 93. At the time of the purchase, Woldiger believed the property was worth approximately $4 million. Tr. 94.

When 175 Inwood Associates took title to the Inwood Site in January 1989, the main tenant in the building was Rockaway Metal Products, Inc. ("Rockaway Metal").

Pl.'s Ex. 19; Tr. 115. Rockaway Metal leased the premises from the previous owner of the building, Einbinder Realty ("Einbinder"), in May 1987. Defs.' Ex. D; Pl.'s Ex. 19. Rockaway Metal's lease was assigned to 175 Inwood Associates when the partnership took title to the Site in January 1989. Pl.'s Ex. 19; Defs.' Ex. K.

Rockaway Metal was in the business of manufacturing steel partitions for offices, and it conducted its manufacturing operation at the Inwood Site. Tr. 94, 95. Prior to the purchase of the Site by 175 Inwood Associates, Rockaway Metal had experienced significant financial difficulties. By way of example, Rockaway Metal filed for Chapter 11 Bankruptcy in October 1987. Defs.' Ex. C. The following year, Rockaway Metal sold a portion of its business known as the "storage box division." Defs.' Ex. D. As a result of this sale, Rockaway Metal no longer required all of the demised premises at the Inwood Site and in October 1988 it agreed to a partial surrender of its lease. Defs.' Ex. D. Einbinder, who at that point was still the owner of the Inwood Site and Rockaway Metal's landlord, subleased the surrendered space to Elg Haniel Trading ("Elg Haniel"), a steel coil trader. Tr. 110. On November 13, 1988, Elg Haniel wrote a letter to Einbinder complaining that an oven previously used by Rockaway Metal had not been removed from the subleased space. Defs.' Ex. F. Defendants claim that Rockaway Metal's partial surrender of its lease and Elg Haniel's November 13 letter show that Rockaway Metal had ceased operating at the Site prior to 175 Inwood Associates' purchase of the property, but the government disputes this claim. The Court will address this dispute later in the instant order.

At the closing in January 1989, 175 Inwood Associates received an estoppel certificate from Einbinder, which stated that Rockaway Metal was a tenant on the premises and that there were no problems with the property. Defs.' Ex. L; Tr. 124. Prior to the closing, both Woldiger and Taub visited the Site, Tr. 93, 108, 114, but 175 Inwood Associates did not retain any consultants or engineers to give opinions on the property, nor were any environmental studies done on the property, Tr. 93.

Shortly after taking title to the Site, 175 Inwood Associates discovered that there was an environmental problem associated with Rockaway Metal's manufacturing operation. Tr. 78, 98. In May 1989, four months after 175 Inwood Associates closed on the property, Rockaway Metal "abandoned the Inwood Site, leaving behind hazardous substance-containing wastes generated in its manufacturing operations." Pretrial Order ¶ 2. The waste left at the Inwood Site by Rockaway Metal was contained in over two hundred barrels, an above-ground tank, and underground storage tanks. Tr. 97; Pl.'s Ex. 24. At some point after Rockaway Metal abandoned the Inwood Site, Hoffman discussed environmental problems at the Site with Peter Johnson, a vice president at Citytrust, Tr. 78–79; Pl.'s Exs. 77, 80, 85, but left the problem to be dealt with by Woldiger and Taub who were the day-to-day managers of the property. Tr. 79–80.

Additionally, in its last several months of tenancy at the Inwood Site during early 1989, Rockaway Metal bounced several rent checks and ceased paying rent altogether soon after 175 Inwood Associates purchased the Inwood Site. Tr. 109, 115. With no rent coming in from its primary tenant, 175 Inwood Associates also began experiencing financial problems, and it stopped making mortgage payments to Citytrust soon after buying the Inwood Site. Tr. 98. Rockaway Metal abandoned the Inwood Site in May 1989. Pretrial Order ¶ 2. In October 1989, Citytrust com-

menced a foreclosure action against 175 Inwood Associates. Pretrial Order ¶ 3.

In 1990, Citytrust had an environmental study prepared by Geraghty and Miller, an environmental consulting firm, concerning the Inwood Site. Pl.'s Ex. 88; Tr. 98. In the fall of 1990, both Hoffman and Woldiger received the results of Geraghty and Miller's study. Pl.'s Exs. 83, 88; Tr. 80–81, 98–99. Geraghty and Miller's assessment indicated that there were several environmental problems at the Inwood Site stemming from the waste left behind by Rockaway Metal that required remediation. Pl.'s Ex. 83. Geraghty and Miller, in an October 18, 1990 letter to Woldiger, described three activities as being most critical with respect to cleanup of the Inwood Site: (1) removal of chemical wastes and contaminated equipment; (2) removal of four underground storage tanks and one above ground tanker truck; and (3) an intrusive sampling program to determine the extent of soil and/or ground water contamination. Pl.'s Ex. 88. Hoffman made handwritten notations on a letter from Citytrust written to Hoffman and Woldiger, dated October 22, 1990, which characterized Geraghty and Miller's proposed plan as "very expensive" and "not practical." Pl.'s Ex. 85; Tr. 81–82.

On December 12, 1990, after inspecting the environmental condition of the Inwood Site, the Nassau County Department of Health ("NCDOH") wrote a letter to 175 Inwood Associates citing violations of county and state law. Pretrial Order ¶ 4. On December 18, 1990, Hoffman faxed a note to Peter Johnson at Citytrust, which said, "Well, we waited so long the county is now on us." Pl.'s Ex. 86; Tr. 82–83. On December 27, 1990, 175 Inwood Associates advised the NCDOH that it would not be able to comply with the requirements of the December 12 letter due to the pending foreclosure action by Citytrust. Pl.'s Ex. 7; Defs.' Ex. AI. 175 Inwood Associates

did not undertake any of the activities recommended by Geraghty and Miller in the remainder of 1990. Tr. 99–100.

In August 1991, the Inwood Site was referred by NCDOH to the New York State Department of Environmental Conservation ("NYSDEC"). Pretrial Order ¶ 5. In a letter dated May 13, 1992, the NYSDEC wrote to 175 Inwood Associates seeking a voluntary cleanup of the Inwood Site. Pretrial Order ¶ 6; Pl.'s Ex. 10. The letter stated that several potentially hazardous items at the Site needed to be remediated as soon as possible: (1) approximately 165 drums with wastes, some leaking, some open, some bulging; (2) underground tanks to be emptied, cleaned, removed, or abandoned; (3) a tanker truck; and (4) a drywell. Pl.'s Ex. 10. On May 26, 1992, 175 Inwood Associates notified the NYSDEC that because of the pending foreclosure by Citytrust "additional time is needed before remedial action is taken." Pl.'s Ex. 11.

In June 1992, the Inwood Site was referred by NYSDEC to the EPA. Pretrial Order ¶ 7. Soon thereafter, Dilshad Perera, an On–Scene Coordinator ("OSC") for the EPA, toured the Inwood Site with an official from NYSDEC. Tr. 13. Perera observed approximately two hundred dangerous 55–gallon drums that had been left at the Inwood Site. Tr. 14; Pl.'s Exs. 24, 31. Perera characterized the drums as dangerous for several reasons: (1) the drums were deteriorating, rusting, and bulging and the contents inside these drums could get out, Tr. 14–15; (2) some of the drums had covers that were rusted through, which created the potential for the liquid material inside the drums to evaporate into the atmosphere, Tr. 15–16; and (3) some drums stationed on a grassy area did not have lids, *and the contents were spilling onto the ground,* Tr. 59; Pl.'s Exs. 24, 31. Perrera later informed De-

fendants' attorneys of the state of these drums. Tr. 57. While inspecting, Perera also observed an above ground tanker-trailer that was suspected to contain dangerous chemical solvents. Tr. 14. Also in June 1992, the EPA hired Roy F. Weston, Inc. ("Weston") as part of its technical assistance team at the Inwood Site. Tr. 21. Weston provided a preliminary assessment of the Site and documented all of the potential hazards and health threats present. Pl.'s Ex. 13. In relevant part, Weston found that the solvents found at the Site emitted flammable vapors. Based on Perera's observations and Weston's findings, the EPA identified the chemical solvents contained in the tanker-trailer as the most serious threat at the Inwood Site. Tr. 27–28.

On June 29, 1992, the EPA wrote to 175 Inwood Associates notifying it of its potential liability under CERCLA and seeking performance of the necessary removal action at the Inwood Site pursuant to an Administrative Order on Consent ("AOC"). Pretrial Order ¶ 8. The AOC was an attempt by the EPA to get 175 Inwood Associates to sign an agreement to remediate the Inwood Site voluntarily. Pl.'s Ex. 17. The June 29 letter gave 175 Inwood Associates ten days to notify the EPA of its intent to consent to perform the removal action. Pl.'s Ex. 17. The June 29 notice letter also included a CERCLA section 104(e) Request for Information. Pretrial Order ¶ 8; Pl.'s Ex. 17. On August 14, 1992, 175 Inwood Associates submitted a response to the CERCLA section 104(e) Request for Information that was signed by Woldiger. Pl.'s Ex. 19; Defs.' Ex. AZ. Thereafter, the EPA advised 175 Inwood Associates that the August 14 response was insufficient because it had not provided certain specified information as requested, such as: federal and state tax returns for the partnership and partners, insurance or indemnification agreements, and financial

statements, reports, or projections for the partnership. Pl.'s Ex. 21; Tr. 107.

Following up on its June 29 letter, the EPA attempted to negotiate a consent order in which the EPA and 175 Inwood Associates would agree on the work to be done to remediate the problems at the Inwood Site. Tr. 55–56. The EPA sent 175 Inwood Associates a draft AOC in a letter dated August 26, 1992. Pl.'s Ex. 20. In its August 26 letter, the EPA indicated that 175 Inwood Associates must sign a final version of the AOC by September 30, 1992. Pl.'s Ex. 20. To ensure that this deadline could be met, the EPA indicated that it had "set aside the week of September 7th to negotiate an agreement" on the removal action at the Inwood Site. Pl.'s Ex. 20. In a letter dated September 10, 1992, the EPA indicated that after repeated phone calls it had received no response from 175 Inwood Associates with respect to its August 26 letter. Pl.'s Ex. 23. 175 Inwood Associates never signed the AOC. Pl.'s Ex. 24.

On September 30, 1992, the EPA unilaterally issued Administrative Order Index Number II–CERCLA–20224 ("UAO") to 175 Inwood Associates under section 106(a) of CERCLA, requiring 175 Inwood Associates to perform the necessary cleanup at the Inwood Site. Pretrial Order ¶ 9; Pl.'s Ex. 24. Among its many detailed requirements, the UAO set forth a "Description of Work" that outlined specific actions that needed to be taken and deadlines that needed to be met to successfully complete the cleanup of the Inwood Site, which specifically included the clean up of the spilled drums. Pl.'s Ex. 24 ¶¶ 17–26. The UAO also included a "Notice of Intent to Comply," which gave 175 Inwood Associates five days after the effective date of the Order to give notice of its intent to comply with its terms. Pl.'s Ex. 24 ¶ 75. The EPA agreed that the effective date of

the UAO would be extended to October 19, 1992, making the Notice of Intent to Comply due on October 23, 1992. Pl.'s Ex. 25. On October 26, 1992, the EPA notified 175 Inwood Associates via letter that the Notice of Intent to Comply was overdue. Pl.'s Ex. 27.

At approximately the same time the UAO was issued, 175 Inwood Associates engaged Environmental Remediation Associates ("ERA") to effect the cleanup of the Inwood Site. Pretrial Order ¶ 9(a). 175 Inwood Associates was aware that the UAO provided deadlines it was required to meet with respect to certain remediation activities. Tr. 116. On October 14, 1992, 175 Inwood Associates filed for Chapter 11 Bankruptcy. Pl.'s Ex. 26. On October 28, 1992, Woldiger wrote the EPA requesting a time extension to comply with the UAO due to the pending bankruptcy and foreclosure proceedings. Defs.' Ex. BE.

Due to the unresponsiveness of 175 Inwood Associates, the EPA sought "Consent for Access to Property" from 175 Inwood Associates, by a letter dated October 28, 1992, in order to stabilize the condition at the Inwood Site. Pl.'s Ex. 28. In a December 3, 1992 letter, the EPA outlined various failures of 175 Inwood Associates to comply with the requirements of the UAO to date. Pl.'s Ex. 30. Items of concern cited by the EPA's December 3 letter included: (1) submission of Notice of Intent to Comply eleven days late; (2) site stabilization measures completed thirty-two days late; (3) failure to submit an adequate site operations plan; (4) failure to certify that all contractors were adequately insured; (5) failure to provide written bi-weekly progress reports; and (6) failure to document that all workers were OSHA certified. Pl.'s Ex. 30.

In February 1993, the EPA approved an Action Memorandum for the Inwood Site, which authorized the EPA to spend Superfund monies to conduct the removal action itself. Pretrial Order ¶ 10; Pl.'s Ex. 31. The Action Memorandum was issued in response to the continuing non-compliance of 175 Inwood Associates and its remediator, ERA. Pl.'s Ex. 31; Tr. 39–40. ERA failed to provide the EPA with work plans, health and safety documentation, or progress reports as required by the UAO. Tr. 39–40.

By letter dated February 23, 1993, the "EPA sought access to the Inwood Site from 175 Inwood Associates so that EPA could perform the necessary removal work itself." Pretrial Order ¶ 11. The EPA's February 23 letter indicated that if 175 Inwood Associates did not sign and return the enclosed "Consent For Access To Property" within one week of the date of the letter it would be construed as a denial of the EPA's request for access. Pl.'s Ex. 33. 175 Inwood Associates did not sign the Consent For Access To Property enclosed in the EPA's February 23 letter. Tr. 40–41. Nevertheless, Perera and Weston entered and inspected the Inwood Site on April 7, 1993 in order to prepare to conduct the cleanup. Tr. 41–42; Pl.'s Ex. 38. At the inspection, Perera and Weston were joined by PT & L, a new remediator hired by 175 Inwood Associates to replace ERA. Pretrial Order ¶ 14(a). During his inspection, Perera discovered that approximately twenty five high hazard drums containing flammable liquids had been moved from their original staging area to a location near one of the other tenants at the Site, a party favors company. Tr. 43; Pl.'s Ex. 38. Perera believed that the placement of these drums in close proximity to the party favors company and its employees constituted an immediate threat to public health or welfare or the environment under the UAO and required immediate removal. Tr. 44–45; Pl.'s Ex. 24 at ¶ 37.

On April 12, 1993, the EPA issued Administrative Order Index Number II–CERCLA–104–93–0201 (the "Access Order") to 175 Inwood Associates and Abraham Woldiger, directing compliance with the EPA's request for access to the Inwood Site. Pretrial Order ¶ 14; Pl.'s Ex. 38. Like the UAO, the Access Order also contained a Notice of Intent to Comply, which required 175 Inwood Associates to provide written notice of intent to comply within three days of the effective date of the Order. PX 38 at ¶ 22. 175 Inwood Associates failed to provide the EPA with written notice of its intent to comply with the Access Order. Pl.'s Ex. 44.

In April 1993, the EPA also sent additional CERCLA Section 104(e) Requests for Information to the individual partners of 175 Inwood Associates, Woldiger, Taub, and Hoffman. Pretrial Order ¶ 12; Pl.'s Exs. 35, 36, 37, 39. The EPA had previously sent a CERCLA Section 104(e) Request for Information to 175 Inwood Associates in June 1992. Pretrial Order ¶ 8; Pl.'s Ex. 17. The EPA determined that 175 Inwood Associates' August 1992 response to its June 1992 Request for Information was insufficient because it omitted specific requested information. Pl.'s Exs. 19, 21; Defs.' Ex. AZ; Tr. 107. In its April 1993 letters to Woldiger, Taub, and Hoffman, the EPA stated that individual responses to the Requests for Information should be postmarked or received at the EPA within fourteen calendar days of receipt of the letter. Pl.'s Exs. 35, 36, 37, 39. In letters dated May 18, 1993, the EPA notified Woldiger, Taub, and Hoffman that their responses to the EPA's Requests for Information were overdue and that they were subject to penalties of up to $25,000 per day for their non-compliance. Pl.'s Exs. 41, 42, 43. Woldiger and Taub did not respond to the April 1993 Requests for Information until they submitted supplemental answers on July 10, 1995. Pl.'s Exs. 49, 50; Tr. 108, 118. Hoffman never responded to the April 1993 Request for Information.

In June 1993, as a result of a mortgage foreclosure action, the Federal Deposit Insurance Corporation, as receiver for Citytrust, conveyed title for the Inwood Site to 175 Roger Corporation in exchange for $91,000. Pretrial Order ¶ 15. The shareholders of 175 Roger Corporation are Woldiger, Taub, and Hoffman. Tr. 103, 117. 175 Roger Corporation was formed to purchase the Inwood Site at the foreclosure sale. Tr. 83–84, 103. Before the foreclosure sale, 175 Inwood Associates still owed approximately $3.5 million to Citytrust on the original mortgage. Tr. 106.

In September 1993, the EPA wrote 175 Inwood Associates, Woldiger, Taub, and Hoffman demanding reimbursement of the EPA's site response costs and payment of civil penalties for violations of the UAO, the EPA Requests for Information and the Access Order. Pretrial Order ¶ 16. Also in September 1993, the EPA wrote to 175 Roger Corporation demanding reimbursement of the EPA's site response costs and enclosing a Section 104(e) Request for Information. Pretrial Order ¶ 17. The Defense disputes the fact that the EPA incurred compensable response costs in addressing the situation at the Inwood Site. Because Defendants assert this argument as an affirmative defense, the Court will address it in Part III *infra.*

In April 1995, the Defendants finally completed the removal action at the Inwood Site. Pretrial Order ¶ 18; Tr. 49.

## II. CONCLUSIONS OF FACT AND LAW

As mentioned *supra*, this action is brought pursuant to Section 107(a) of CERCLA. *See* 42 U.S.C. § 9607(a). To establish a *prima facie* case under Section 107(a) of CERCLA, the United States must prove five elements: (1) the Defen-

dants are within one of the four categories of responsible parties enumerated in § 9607(a); (2) the Inwood Site is a "facility" as defined in § 9601(9); (3) there was a "release" or "threatened release" of "hazardous substances" at the facility; (4) the United States incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan under 42 U.S.C. § 9607(a)(4)(A) as administered by the EPA. U.S.C. § 9607(a); *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir.1996); *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719–20 (2d Cir.1993) ("*Alcan I*").

Applying the undisputed facts, *see supra* Part I, the United States has satisfied its burden of proof as to elements (2)-(5), and the Court formally finds:

- the Inwood Site is a "facility" as defined in § 9601(9);
- there was a "release" or "threatened release" of "hazardous substances" at the facility;
- the United States incurred costs responding to the release or threatened release; and
- the costs and response actions conform to the national contingency plan under 42 U.S.C. § 9607(a)(4)(A) as administered by the EPA.

With those four elements established, only the question of whether the Defendants constitute responsible parties under Section 107(a) of CERCLA warrants further inquiry.

Section 107(a) identifies several categories of responsible parties, or "covered persons," that are liable under the statute. The relevant portion of Section 107(a) reads:

*Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-*

(1) the owner and operator of a vessel or a facility,

(2) *any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,*

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for-

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study car-

ried out under section 9604(I) of this title.

42 U.S.C. § 9607(a) (emphasis added).

■ The United States asserts that the each of the Defendants is liable under Section 107(a)(2). Thus, stated differently, the United States argues that Defendants constitute "person[s] who at the time of disposal of any hazardous substance owned . . . [a] facility at which such hazardous substances were disposed of . . . ." *Id.* To determine whether the Defendants are covered by Section 107(a)(2) it is necessary to define several of the terms used therein by turning to Section 101 of CERCLA. 42 U.S.C. § 9601. The terms include "person," "disposal," "hazardous substance," and "owner or operator." Beginning with "person" and proceeding in order, the Court will define those terms as they relate to the instant circumstances.

The definition of "person" encompasses "an individual, firm, corporation, association, [or] partnership . . . ." 42 U.S.C. § 9601(21). Under this statutory definition, all of the Defendants are "persons" under Section 107(a)(2).

By reference to the "disposal" definition under Section 1004 of the Solid Waste Disposal Act, Section 101 of CERCLA defines "disposal" to mean "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3); 42 U.S.C. § 9601(29). The Court finds that this broad definition covers the activities Rockaway Metal engaged in pursuant to the disposal of its waste materials prior to abandoning the Inwood Site, *see supra* Part I.

"Hazardous substance" is also defined by reference to several other environmental statutes. 42 U.S.C. § 9601(14). The term includes:

(A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C.S.. § 1321(b)(2)(A) ], (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [42 U.S.C.S. § 9602], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.S. § 6921] . . . (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 U.S.C.S. § 1317(a) ], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.S. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C.S. § 2606].

Given the scope of this definition, "the statute on its face applies to 'any' hazardous substance, and it does not impose quantitative requirements." *Alcan I*, 990 F.2d at 720. In light of the assessments of the Inwood Site by Geraghty and Miller, NCDOH, NYSDEC, Weston, and the EPA, *see supra* Part I, the Court finds that the waste materials left at the Inwood Site are properly categorized as "hazardous substances" under Section 101(14). 42 U.S.C. § 9601(14).

Finally, the phrase "owner or operator" is defined to mean "(ii) in the case of an onshore facility or offshore facility, any person owning or operating such facility." 42 U.S.C. § 9601(20)(A)(ii). Applying that definition, the Second Circuit has held that an individual may be liable as an "owner or operator" even if he did not actively participate in the management of the site or

contribute to the release of the hazardous substances. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044–45 (2d Cir. 1985). Considering the undisputed facts in this case, *see supra* Part I, the Court notes that Defendants 175 Inwood Associates, Abraham Woldiger, Abraham Taub, and Peter Hoffman all received, whether directly or passing through the 175 Inwood Associates entity, lease payments from Rockaway Metal while the hazardous materials were being disposed of at the Site. Upon this observation, the Court concludes that Defendants 175 Inwood Associates LLP, Abraham Woldiger, Abraham Taub, and Peter Hoffman all qualify as "owner[s]" under Section 107(a)(2).

Defendant Peter Hoffman claims that he was not an "owner or operator" of the Inwood Site under the statutory definition and pleads indicia of ownership primarily to protect a security interest under § 9601(20)(A). Since Hoffman asserts this as an affirmative defense to liability under Section 107(a) of CERCLA, the Court will address this issue in Part III of this Order. As will be discussed more fully in that section, the Court concludes that all Defendants are "owner[s]" under CERCLA. *See* 42 U.S.C. § 9607(a)(2). Accordingly, the Court, for the purposes of the instant section moves on to the next relevant portion of the statute to ascertain Defendants' liability: the timing of Defendants' ownership.

■ Consistent with the statutory language of CERCLA Section 107(a)(2), the only remaining question surrounding liability is whether Defendants owned and operated the Inwood Site "at the time of disposal of any hazardous substance." In *New York v. Shore Realty Corp.*, the Second Circuit explained that liability does not extend to all former owners or operators of a facility under Section 107(a) of CERCLA; it applies only to those former owners or operators who owned or operated the facility "at the time of disposal" of a hazardous substance. 759 F.2d at 1043–44. Consequently, former owners or operators can be held liable if any disposal of hazardous substances occurred at the site during the time that they were the owners. *Id.* at 1044. Furthermore, those contemporaneous owners are primarily liable under the act for the costs of disposal, without regard to the proportion of hazardous materials which were released during ownership. *Id.* (stating that CERCLA "unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release [of hazardous materials], without regard to causation"). Upon the evidentiary record, 175 Inwood Associates was the owner of the Site as of 1989. 175 Roger Corporation is also, upon the evidentiary record an owner of the Site. (However, as seen below, 175 Roger Corporation was not the owner at the time of disposal of some hazardous materials on the Site.) As discussed more fully *infra*, the individual defendants that formed 175 Inwood Associates, Woldiger, Taub and Hoffman, are also considered as owners for the purposes of CERCLA due to their general partnership liability under New York law. The reasons for this liability require a detailed discussion.

As mentioned *supra*, Woldiger, Taub and Hoffman are general partners in a limited liability partnership. In relevant part, Section 26 of New York Partnership Law provides:

(a) Except as provided in subdivision (b) of this section, *all partners are liable:*

1. Jointly and severally for everything chargeable to the partnership under sections twenty-four and twenty-five.

2. *Jointly for all other debts and obligations of the partnership;*

but any partner may enter into a separate obligation to perform a partnership contract.

(b) Except as provided by subdivisions (c) and (d) of this section, *no partner of a partnership which is a registered limited liability partnership is liable or accountable, directly or indirectly ... for any debts, obligations, or liabilities of, or chargeable to, the registered limited liability partnership ... whether arising in tort, contract, or otherwise, which are incurred, created or assumed by such partnership while such partnership is a registered limited liability partnership. solely by reason of being such a partner* or acting (or omitting to act) in such capacity or rendering professional services or otherwise participating (as an employee, consultant, contractor or otherwise) in the conduct of the other business or activities of the registered limited liability partnership.

N.Y. Partnership Law § 26 (McKinney 2004).

While subsection (a)(2) indicates that all partners in normal partnerships are liable jointly for all debts and obligations of the partnership, subsection (b) indicates that a different standard applies to partners in a limited liability partnership. Thus, under New York Partnership law Woldiger, Taub, and Hoffman, as general partners in a limited liability partnership, cannot be held individually liable "for any debts, obligations, or liabilities" of 175 Inwood Associates "solely by reason of being such a partner" in the entity. *Id.*

■ However, after reviewing the relevant case law, the Court has determined that, under New York Partnership law, general partners in a limited liability partnership are not protected as individuals from liability incurred by the partnership if the assets of the partnership are insufficient to satisfy the liability. *See Bank of New York v. Ansonia Assoc.*, 172 Misc.2d 70, 656 N.Y.S.2d 813, 819 (1997) ("general partners [in limited liability partnerships] are individually liable for payment of partnership liabilities if they cannot be paid out of partnership assets"); *Belgian Overseas Securities Corp. v. Howell Kessler Co.*, 88 A.D.2d 559, 450 N.Y.S.2d 493, 494 (1st Dep't 1982) ("When partnership assets are insufficient to pay [limited liability] partnership debts, creditors may look to the general partners to satisfy the debts."); *Helmsley v. Cohen*, 56 A.D.2d 519, 391 N.Y.S.2d 522, 523 (1st Dep't 1977) ("individual assets are chargeable for [limited liability] partnership debts only after partnership is adjudicated bankrupt, or, ... when joint or partnership property is insufficient to pay partnership and there appears to be no effective remedy without resort to individual property").

Here, since it is undisputed that 175 Inwood Associates has no assets, *see supra*, Part I, the Court finds that, under New York law, the general partners of 175 Inwood Associates, Woldiger, Taub, and Hoffman, are individually liable for the CERCLA liability incurred by the partnership. With that partnership issue resolved, the Court now returns to the CERCLA analysis.

For all of the reasons discussed *supra*, the Court concludes that all of the Defendants are owners of the Inwood Site. As the trier of fact in this case, and based upon the evidence discussed below, the Court further finds that the Defendants, other than 175 Roger Corp., did own the Inwood Site at the time of disposal of some hazardous substances. The Court sets out its reasons for this conclusion, as well as its reasons for not accepting Defendants' arguments to the contrary, *infra*. However, before reaching that discussion, the Court must address Defendants' argument

that no hazardous materials were disposed of during their ownership of the Site.

Defendants argue that Rockaway Metal had ceased its manufacturing operations at the Inwood Site sometime during late 1988. Defendants contend that this proves that Rockaway Metal had stopped disposing of hazardous substances, as defined by Section 107(a)(2), before 175 Inwood Associates purchased the property in January 1989. In light of the record in this case, the Court finds this argument unconvincing.

Defendants point to two pieces of evidence to support its position that Rockaway Metal did not dispose of hazardous substances while Defendants were the owners and operators of the Inwood Site: a letter written by Elg Haniel to Einbinder and Abraham Taub's testimony at trial.

Elg Haniel's letter to Einbinder on November 13, 1988 was a laundry list of complaints related to Einbinder's alleged failure to perform its basic contractual duties as the lessor of the property. One of the listed complaints referenced an oven previously used by Rockaway Metal that had not been removed from Elg Haniel's subleased space. Defendants assert that the oven left in Elg Haniel's subleased space was the source of the waste materials produced at the Site. Defendants believe evidence indicating that the oven was abandoned proves that Rockaway Metal could not have been disposing of hazardous substances after November 13, 1988 or at any time while Defendants owned and operated the Inwood Site.

Defendants also believe their position is supported by one portion of Taub's trial testimony, which indicates that Rockaway Metal's steel painting division was closed down before 175 Inwood Associates purchased the property. Tr. 111. This closure, Defendants maintain, eliminated any chance that hazardous materials were generated and disposed of during the relevant period.

Despite the Defendants' assertions to the contrary, the Court finds that the weight of the evidence clearly demonstrates that Defendants, other than Defendant 175 Roger Corp., the liability of which will be discussed *infra*, did own the Inwood Site "at the time of disposal of a[ ] hazardous substance." First, Defendants' claim that the oven was the sole source of the hazardous substances generated at the Inwood Site is not supported by any evidence in the record. *See supra*, Part I. Second, at trial the United States demonstrated that Woldiger's testimony, on the question of whether Rockaway Metal was operating at the Inwood Site at the time 175 Inwood Associates purchased the property, contradicted earlier statements that he made in his sworn deposition. Tr. 95–97. In his deposition, Woldiger stated that Rockaway Metal operated at the Inwood Site for "a few months" after 175 Inwood Associates took title to the property. Tr. 96. Third, Taub also testified that Rockaway Metal was "in the site" at the time 175 Inwood Associates purchased the property. Tr. 115. Ultimately, acting as the finder of fact, the Court concludes that the November 13 letter serves only to buttress the already undisputed facts that Rockaway Metal surrendered a portion of its leased space during 1988 and that Einbinder subleased that space to Elg Haniel. Defendants' contention that these items of evidence somehow prove that Rockaway Metal had ceased its operations, and hence ceased disposing of hazardous substances, at the Inwood Site prior to November 1988 is not supported by the record. *See supra*, Part I. Moreover, the evidentiary record indicates that drums of hazardous materials were spilling on the Site in 1992, Tr. 59, a fact that was communicated to Defendants' attorneys at the time, Tr. 57, and which was communicated in the unilateral

administrative order, Pl.'s Ex. 31. Therefore, upon all of this evidence, the Court concludes that Defendants, other than 175 Roger Corporation, did indeed own or operate the facility "at the time of disposal of a[ ] hazardous substance."

The liability of Defendant 175 Roger Corporation, however, has not been established. Title to the Inwood Site was conveyed to 175 Roger Corporation at the June 1993 foreclosure action. However, the United States has not identified evidence that would establish the disposal of hazardous materials at the Inwood Site after that conveyance. Therefore, although the shareholders of 175 Roger Corporation are Woldiger, Taub, and Hoffman, who are liable in this action, the corporation that they own is not liable in this action.

Based upon the foregoing evidence, the Court concludes that the United States has established a *prima facie* case against Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates under Section 107(a) of CERCLA. However, the Court also finds that the United States has failed to establish that Defendant 175 Roger Corporation owned the Inwood Site when the disposal of some hazardous materials occurred. Therefore, 175 Roger Corporation cannot be liable under CERCLA. The Court now considers the affirmative defenses asserted by Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates. From this point forward, when the Court refers to Defendants, it is referring to Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates but not to 175 Roger Corporation. When 175 Roger Corporation is intended to be included in a statement, the entity will be expressly referenced.

## III. AFFIRMATIVE DEFENSES

In light of the Court's determination that the United States has made out a *prima facie* case under Section 107(a) of CERCLA, Defendants must establish an affirmative defense to avoid the imposition of liability. Defendants have articulated several different affirmative defenses. Section 107(b) lists the defenses available under CERCLA. *See* 42 U.S.C. § 9607(b). As an initial matter, the numerosity of the defenses asserted by Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates, especially when evaluated against the limited affirmative defenses that are articulated in Section 107(b), poses a problem.

The preface to Section 107(a) indicates that the defenses listed in Section 107(b) constitute the exclusive defenses available under CERCLA. The relevant portion of Section 107(a) states that CERCLA liability is "subject *only* to the defenses set forth in subsection (b) of this section." 42 U.S.C. § 9607(a) (emphasis added). As indicated *supra*, Defendants assert numerous affirmative defenses, several of which are not embraced by Section 107(b). Courts have opined that affirmative defenses beyond those explicitly set forth in 107(b) are barred. *See, e.g., United States v. Kramer*, 757 F.Supp. 397, 410 (D.N.J. 1991). Other Courts have indicated that certain unenumerated affirmative defenses are available to CERCLA defendants. *See, e.g., Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d 1286, 1303 (11th Cir.2002). To the Court's knowledge, the Second Circuit has not weighed in on this issue. However, for the purposes of the instant decision, the Court will not resolve this exclusivity issue. As more fully discussed *infra*, the Court finds that none of the asserted affirmative defenses, evaluated on their merits, insulates Defendants from liability under Section 107(a) of CERCLA. Accordingly, for the purposes of this Order, the Court assumes *arguendo* that all of the affirmative defenses asserted by the Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates, even

those not outlined in Section 107(b), may legitimately be asserted under CERCLA and considers each one on its merits.

### A. "An Act or Omission of a Third Party."

The text of Section 107(b) reads:

There shall be no liability under subsection [107](a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused by-

(1) an act of God;

(2) an act of war;

(3) *an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant* (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), *if the defendant by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions;* or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b) (emphasis added).

■ Defendants argue that they are entitled to assert an affirmative defense under Section 107(b)(3) based on "an act or omission of a third party." To prevail with this affirmative defense, Defendants must prove by a preponderance of the evidence that: (1) there was no "contractual relationship, existing directly or indirectly" between Rockaway Metal and Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates; (2) Defendants "exercised due care with respect to the hazardous substance" disposed of at the Inwood Site by Rockaway Metal; and (3) Defendants took precautions against "foreseeable acts or omissions" by Rockaway Metal and "the consequences that could foreseeably result from such acts or omissions." 42 U.S.C. 9607(b). Because Section 107(b)(3) is written using the conjunctive "and," Defendants must prove all three of these elements to prevail. *See United States v. Chrysler Corp.*, 157 F.Supp.2d 849, 862 (N.D.Ohio 2001). In its role as factfinder in this case, the Court concludes that the Defendants fail to meet their burden of proof on each of the elements pertinent to the Section 107(b)(3) third party defense.

Defendants cannot assert the third party defense under Section 107(b)(3) because they had a direct contractual relationship with Rockaway Metal. For the purpose of Section 107(b)(3), the term "contractual relationship," includes, but is not limited to:

land contracts, deeds, easements, leases, or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (I), (ii), or (iii) is also established by a preponderance of the evidence . . .

42 U.S.C. § 9601(35)(A).

The proffered evidence clearly establishes Rockaway Metal was a tenant at the Inwood Site when the Site was purchased

by Defendants and that Rockaway Metal's existing lease with Einbinder was assigned to 175 Inwood Associates. *See supra,* Part I. As a result of the assignment, Rockaway Metal became 175 Inwood Associates' tenant pursuant to the terms of its existing lease. Defs.' Ex. A. Under the plain language of the definition quoted above, a lease constitutes a "contractual relationship" under Section 107(b)(3); thus, 175 Inwood Associates and Rockaway Metal had a "contractual relationship." Defendants disagree.

In connection with this argument, Defendants rely upon the *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.* as the appropriate test in the Second Circuit when there is a question whether there is a "contractual relationship" under Section 107(b)(3). 964 F.2d 85, 89 (2d Cir.1992). In *Westwood,* the Second Circuit stated that a landowner is precluded from raising the third party defense only if: (1) "the contract between the landowner and the third party somehow is connected with the handling of hazardous substances," or (2) "the contract allows the landowner to exert some control over the third party's actions so that the landowner can fairly be held liable for the release or threatened release of hazardous substances caused solely by the actions of the third party." *Id.* Applying *Westwood's* disjunctive two-prong test, the Court concludes that Defendants had a "contractual relationship" with Rockaway Metal.

As to the issue of whether the contract between 175 Inwood Associates and Rockaway Metal was somehow "connected with the handling of hazardous substances," i.e. the first prong of the *Westwood* analysis, Rockaway Metal's lease specifically stated that the premises "shall be used by Tenant for the purpose of conducting a metal manufacturing and related service business thereon." Defs.' Ex. A, Art. III, § 1. In the instant case, it is undisputed that Rockaway Metals' manufacturing operations, which were explicitly mentioned in the lease, produced "flammable wastes," "lead based paint sludge," and "petroleum solvents," all of which were stored at the Inwood Site. *See* Pl.'s Ex. 20 at 2. Furthermore, the evidence indicates that such hazardous materials are the typical byproducts of the metal manufacturing activities engaged in by Rockaway Metal. *See id.;* Pretrial Order ¶ 2. Such activities, since they were referenced in the lease, therefore indicate that the lease was "connected with the handling of hazardous substances." *See State of New York v. Westwood–Squibb Pharm. Co., Inc.,* 138 F.Supp.2d 372, 387 (W.D.N.Y.2000) (holding that a lease that expressly provided for activities that produce certain gases therefore concerns the disposal of those gases); *see also United States v. A & N Cleaners and Launderers, Inc.,* 788 F.Supp. 1317, 1335 (S.D.N.Y.1992) (lease contemplated a dry-cleaning business); *Shapiro v. Alexanderson,* 743 F.Supp. 268 (S.D.N.Y.1990) (lease contemplated operating a landfill). Accordingly, the first prong of the *Westwood* analysis indicates that Defendants cannot assert a Section 107(b)(3) affirmative defense.

Because, consistent with the findings above, the Court finds that Defendants have failed to satisfy the first prong of the *Westwood* test, the Court does not reach the second prong of the analysis, which concerns the Defendants' ability "to exert some control over the third party's actions." However, The Court's analysis of the Section 107(b)(3) third party defense does not end. Defendants also argue that the specific facts surrounding the lease contract prevent a finding that a "contractual relationship" existed.

■ Defendants claim that a lease assigned to a third party does not create a

"contractual relationship" between the tenant and the third party landlord under Section 107(b)(3). However, Defendants cite no authority for this proposition. Furthermore, the Court's reading of the statute and the associated case law does not support this contention. *See Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.,* 964 F.2d 85, 89 (2d Cir.1992) (stating that a "contractual relationship exists if the defendant is the landowner and the lease allows some control over the use of the land or expressly concerns the disposal of hazardous substances"); *Emerson Enterprises, LLC v. Kenneth Crosby Acquisition Corp.,* No. 03–CV–6530, 2004 WL 1454389, at *5–6 (W.D.N.Y. June 23, 2004). Indeed, under New York law, so long as the sale of the land and the assignment of the rights under the lease are valid, the buyer of land who receives an assignment of a lease stands in the shoes of the initial lessor. *See Reltron Corp. v. Voxakis Enterprises, Inc.,* 57 A.D.2d 134, 395 N.Y.S.2d 276, 279 (4th Dep't 1977); *World Challenge v. 39 Food, Inc.,* 163 Misc.2d 1081, 623 N.Y.S.2d 498 (1994); *Poughkeepsie Sav. Bank v. R & G Sloane Mfg. Co., Inc.,* 84 A.D.2d 212, 445 N.Y.S.2d 560 (2d Dep't 1981). Thus, according to the Court's research, the situation surrounding Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' acquisition of the lease did not affect that lease's legal character or the reciprocal duties owed by the parties under that lease. *See id.* For these reasons, the Court declines to adopt the contention that a lease which was assigned to the new owners of the property does not create a "contractual relationship" under Section 107(b).

For the foregoing reasons, the Court finds that Defendants are barred from asserting the third party defense under Section 107(b)(3) because a "contractual relationship" existed between Defendants and Rockaway Metal. Due to the structure of Section 107(b)(3), the presence of a "contractual relationship" is independently fatal to Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' Section 107(b)(3) affirmative defense. Accordingly, where, as under the instant facts, there a valid lease expressly mentions the activities that resulted in the disposal of hazardous materials and allows the lessor to assert control of the lessee's activities, the Section 107(b)(3) affirmative defense is unavailable. *See id.* at *6. Nonetheless, the Court will briefly address the remaining elements of such an affirmative defense: "due care" and "foreseeable consequences." For the following reasons, even assuming *arguendo* it was otherwise appropriate, which it was not due to the aforementioned "contractual relationship," Defendants would still be unable to assert the third party defense under Section 107(b)(3) because they did not exercise "due care" or take precautions against the "foreseeable consequences" of Rockaway Metal's hazardous waste disposal.

Defendants cite numerous sources of authority in support of the proposition that they exercised "due care" and took precautions against "foreseeable consequences" with respect to the hazardous substances disposed of at the Inwood Site by Rockaway Metal. *State of New York v. Lashins Arcade Co.,* 91 F.3d 353 (2d Cir.1996); *HRW Systems, Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318 (D.Md.1993); *Containerport Group, Inc. v. American Financial Group, Inc.,* 128 F.Supp.2d 470 (S.D.Ohio 2001); *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321 (7th Cir.1994); *United States v. Monsanto,* 858 F.2d 160 (4th Cir.1988); *United States v. A & N Cleaners and Launderers,* 854 F.Supp. 229 (S.D.N.Y.1994).

Defendants place particular emphasis on *State of New York v. Lashins Arcade Co* as the leading Second Circuit case on the issue of "due care" and "foreseeable conse-

quences" under Section 107(b)(3). 91 F.3d at 353. In *Lashins Arcade,* the Second Circuit affirmed the Southern District of New York's finding that the defendant satisfied its obligation to exercise "due care" within the meaning of Section 107(b)(3) and was not precluded from asserting the third party defense under that subsection. *Lashins Arcade* validated the logic of *HRW Systems, Inc v. Washington Gas Light Co.,* which held "that the 'due care' mandate of § 9607(b)(3) does not 'impose a duty on a purchaser of land to investigate prior to purchase, in order to determine whether there is pollution on the land caused by someone with whom the purchaser is not in contractual privity.'" 823 F.Supp. at 349. The Second Circuit also stressed the fact that the "'due care' inquiry [must] focus upon 'all relevant facts and circumstances.'" *Lashins Arcade,* 91 F.3d at 362. To lend further guidance to courts conducting the "due care" inquiry, the Second Circuit referenced CERCLA's legislative history: "The defendant must demonstrate that he took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." H.R.Rep. No. 1016, 96t Cong., 2d Sess., pt. 1, at 34 (1980), reprinted in U.S.S.C.A.N. 6119, 6137.

■ For the reasons listed below, the Court finds that *Lashins Arcade* fails to support Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' claim that they used "due care" and took precaution against "foreseeable consequences" of Rockaway Metal's hazardous waste disposal. First, the "no duty to investigate" rule only applies to pollution "caused by someone with whom the purchaser is *not* in contractual privity." *HRW Systems,* 823 F.Supp. at 349 (emphasis added). Since the Court has already determined that Defendants were in contractual privity with the party who caused the pollution at the Inwood Site, Rockaway Metal, the "no duty to investigate" rule is inapplicable.

Even if the Court were to assume that Defendants had no duty to investigate prior to purchase, the "relevant facts and circumstances" do not support the conclusion that Defendants fulfilled the requirements of the third party defense under Section 107(b)(3). Assuming *arguendo,* that Defendants had no knowledge of the presence of hazardous substances at the time they purchased the Inwood Site and had no duty to investigate for the presence of such substances prior to purchase, they still had a duty to exercise "due care" and take reasonable precautions against "foreseeable consequences" presented by the hazardous substances of which they were aware. The facts establish that Defendants were on notice about the presence of hazardous substances by the Fall of 1990, when Geraghty and Miller issued the results of its study. *See supra,* Part I. Despite this notice, cleanup activities at the Inwood Site took almost five years to complete and were not concluded until April 1995. As detailed in Part I, the lengthy cleanup process can be attributed in part to the actions and inaction of Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates. In light of these facts, the Court finds that Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' actions fail to demonstrate that they took "all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances."

Additionally, the "relevant facts and circumstances" presented here and those considered in *Lashins Arcade* are vastly different from one another. In *Lashins Arcade,* the defendant: (1) played no role in the events that led to the hazardous waste problem; (2) purchased the proper-

ty directly from the polluter more than fifteen years after the pollution occurred; and (3) purchased the property at a time when public authorities were well along in a program of investigation and remediation. 91 F.3d at 362. By way of contrast, in the instant case: (1) the polluters were Defendants' tenants at the Inwood Site; (2) some tenants released hazardous substances at the Inwood Site while Defendants owned the property; and (3) the property was purchased prior to the start of the government cleanup. *See supra,* Part I. Given the dissimilarity of the "relevant facts and circumstances," the Court finds *Lashins Arcade* distinguishable from the circumstances surrounding the instant case.

In addition, the Court has reviewed the other cases cited by Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates, *see supra,* and finds them to be unpersuasive in this matter. Each case cited is either distinguishable from the instant case on the facts, presents a point of law that proves to be ultimately irrelevant to the issue presented here, or actually supports the conclusion that Defendants did not fulfill the requirements of the third party defense under Section 107(b)(3). As such, the Court finds that Defendants are not shielded from CERCLA liability by the Section 107(b)(3) third party defense.

B. Defendants' Other Affirmative Defenses.

Beyond Section 107(b)(3), Defendants also present several other affirmative defenses to liability under Section 107(a) of CERCLA. After reviewing the additional affirmative defenses proffered by the Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates, the Court finds that none of them merit application in this case.

1. Apportionment.

Defendants argue that under *Alcan I,* the Court should be allowed to apportion

liability, or assess no liability, because they did not generate the hazardous waste at the Inwood Site. 990 F.2d at 720–22. Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' argument rests on the premise that since they did not cause the hazardous waste to be placed at the Site, they should not bear any of the response, oversight and cleanup costs associated with remediating the Site. It bears noting that Defendants do not seek to apportion liability among the various individual defendants upon those defendants' individual liability. Instead, Defendants seek to completely avoid liability due to the fact that they, as mere owners of the property, did not contribute to the actual release of hazardous materials. After careful consideration, the Court rejects this argument for the reasons discussed *infra.* However, prior to discussing those reasons, the Court endeavors to explain what the term "apportionment" means in the CERCLA context.

■ In *Alcan I* the Second Circuit made clear that apportionment is a "special exception" to CERCLA's normal strict liability scheme that applies to "multiple defendants charged with adding hazardous substances to a Superfund site." *Id.* at 721–22. This principle was further elaborated upon in *United States v. Alcan Aluminum Corp.,* 315 F.3d 179 (2d Cir.2003) ("*Alcan II*"). 315 F.3d at 184–186. In *Alcan II,* the Second Circuit noted that apportionment flowed from a "common law gloss to the statutory framework of CERCLA." *Id.* at 184. However, in *Alcan II,* the Second Circuit again emphasized that apportionment was utilized with regard to the question of "whether a party that has contributed hazardous substances to a multi-party waste site should be held jointly and severally liable for the remediation costs incurred there." *Id.* at 185. Consistent with these two cases, a party

may avoid liability "if it either succeeds in proving that its [release of hazardous materials], when mixed with other hazardous wastes, did not contribute to the release and clean-up costs that followed, or contributed at most to only a divisible portion of the harm." *Alcan I,* 990 F.2d at 722. In light of this case law, other cases discussing "owner" liability under CERCLA, as well as the legal principles underlying this case law, the Court has identified several fatal deficiencies in Defendants' argument.

First, as clearly indicated *supra,* Defendants liability does not flow from their introduction of certain hazardous substances to the Inwood Site. Rather, liability in the instant case depends upon Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' status as owners of the Inwood Site. All of the available case law indicates that apportionment is only appropriate among multiple polluting defendants who dispute the effect of their pollution upon the actual cleanup costs. *See, e.g., Bedford Affiliates v. Sills,* 156 F.3d 416, 428 (2d Cir.1998). Such a dispute does not exist in the instant case. Accordingly, apportionment would not be appropriate under the circumstances of the instant case.

Second, as stated in *Alcan II,* apportionment is only appropriate where " 'two or more causes have combined to bring about harm.' " 315 F.3d at 185 (quoting Restatement (Second) of Torts § 433A(1) (1965)). In the instant case, Defendants have not come forward with two or more causes for the release of hazardous materials. Instead, Defendants have merely come forward with a single cause, the actions of Rockaway Metal during the relevant periods, and contend that a mere "ownership" relationship to the release of hazardous materials should trigger apportionment. However, as discussed more fully *supra,* CERCLA expressly provides for owner liability. Moreover, returning to the appro-

priateness of apportionment under the instant circumstances, Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' have failed to indicate the presence of multiple causes that would trigger an apportionment inquiry.

Third, in a related point, Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' possess the burden to show divisibility; a burden which has been characterized as "substantial." *See id.* In the instant case, Defendants have not met this substantial threshold with regard to their "owner" liability under CERCLA. Instead, Defendants contend that either no liability should attach due to their status an owner, a contention that was addressed *supra,* or that the liability should be divided by some uncertain amount. Merely asserting that liability should be apportioned, without providing any meaningful input as to how or why that apportionment should be accomplished, does not meet the relevant "substantial" threshold. Therefore, assuming that such a defense is available, the Court declines to apportion liability.

Fourth, Defendants ask the Court to apportion liability among the named defendants and Rockaway Metal. Defendants fails to explain how it would be appropriate to apportion civil liability to an entity, such as Rockaway Metal, that is not a party to the instant action.

Fifth, the strict liability standard that is applied against owners and operators under CERCLA is inconsistent with the equitable principles embodied by apportionment. The Second Circuit announced the strict liability standard in *Shore Realty.* 759 F.2d at 1044. In that case, the Second Circuit held that Section 107(a)(1) "unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation." *Id.* For this

reason, to prevent the imposition of liability under CERCLA, owners must avail themselves of one of the enumerated affirmative defenses. *See Bedford Affiliates,* 156 F.3d at 425. Should one of these affirmative defenses not apply, an owner is strictly liable under CERCLA. *See id.* This statutory scheme does not provide for equitable apportionment of liability as to owners.

Sixth, the Court notes that Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' argument tacitly urges that, since they did not *cause* the release of hazardous materials at the Inwood Site and were merely owners, they should not be liable under CERCLA for the release of hazardous materials. The Second Circuit has expressly rejected the argument that their must be causal link between the owner and the release of hazardous materials. *See Shore Realty,* 759 F.2d at 1044. Instead, contrary to Defendants' contentions, liability attaches by virtue of their status as owners in the relevant period, not via any constructively added "causation" element. *See id.* Accordingly, the causation argument is without merit.

Finally, as an aside, the Court notes that Defendants' apportionment argument implicates the relative liability of other individuals and entities for the release of hazardous materials at the Inwood Site. CERCLA provides that a private party can recoup some or all of the costs associated with an environmental cleanup" via a "contribution action under § 113(f)(1)" against other parties responsible for the release of hazardous materials. *Bedford Affiliates,* 156 F.3d at 423. It may be that Defendants elect to proceed with such a contribution action and, within the context of that action, an apportionment is made. *See id.* at 429 (discussing apportionment in that context). Indeed such a contribution action may be the appropriate avenue for Defendants to make most of the legal and

factual arguments that fail in the context of the instant action. However, in the context of the instant action, no such contribution claims have been made.

In short, Defendants' apportionment defense cannot serve as a bar to "owner" liability under CERCLA. *See International Clinical Laboratories v. Stevens,* 710 F.Supp. 466, 471 (E.D.N.Y.1989) (equitable principles are not a defense to liability under CERCLA, although it may be used for allocation of contribution claims among CERCLA defendants). Given Congress' intent to impose strict liability on owners and the Court's earlier determination that Defendants are responsible parties under Section 107(a)(2) of CERCLA, the Court finds no merit to Defendants' apportionment argument.

### 2. The Recoverability of the EPA's Costs Under CERCLA.

Next, Defendants argue that under *United States v. Rohm and Haas,* the United States is not entitled to recover oversight costs incurred by the EPA while monitoring the private cleanup of the Inwood Site. 2 F.3d 1265 (3d Cir.1993). To understand this argument, the Court will endeavor to review some of the relevant background facts in this action. As discussed *supra,* after notice from the government, Defendants effected the remediation of the Inwood Site at their own cost. It should be emphasized at this point that Defendants were legally obligated to pay these remediation costs, whether upon cleanup or in a subsequent CERCLA action by the United States to recover these costs. However, in the context of the instant action, the United States seeks, inter alia, to recover for the response and oversight costs it incurred while supervising Defendants' private remediation efforts. Defendants maintain that, consistent with the Third Circuit's *Rohm and Haas* deci-

sion, such costs are not recoverable by the United States.

As an initial matter, *Rohm and Haas* does indeed indicate that response and oversight costs incurred in relation to a private remediation effort are not recoverable by the United States. 2 F.3d at 1278. However, an uncertain portion of the oversight costs claimed by the United States in the *Rohm and Haas* case, unlike in the instant case, were attributable to the Resource Conservation and Recovery Act, which does not provide for any monetary recovery by the United States. *Id.* at 1268–1270. Moreover, *Rohm and Haas* has not been followed in the Second Circuit. In fact, the plain language of CERCLA and *Shore Realty,* a Second Circuit case of more recent vintage than the Third Circuit's *Rohm and Haas* decision, both indicate that the EPA's oversight costs are recoverable as response costs under CERCLA.

█ Beginning with the statutory language of CERCLA, Section 107(a) specifically allows the government to recover "all costs of removal and remedial action" and "any other necessary costs of response incurred by any other persons." 42 U.S.C. § 9607(a). The definitions included in Section 101 of CERCLA support the conclusion that the EPA's activities in the instant case are recoverable by the United States. *See* 42 U.S.C. §§ 9601(23)-(25). Specifically, Section 101(23) of CERCLA defines "remove" or "removal" to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). Section 101(25) also states, "The terms 'respond' or 'response' mean[s] remove, removal, remedy, and remedial action;, [sic] all such terms (including the terms 'removal' and 'remedial action') *include enforcement activities related thereto.*" 42 U.S.C. § 9601(25) (emphasis added). These defi-

nitions support the conclusion that the United States is entitled to recover response costs related to oversight and enforcement even when it does not endeavor to conduct the cleanup itself. Later decisions by the Second Circuit have since applied this language to embrace activities by entities such as the EPA.

In *Shore Realty* the Second Circuit wrote, "[t]he [Government's] costs in assessing the conditions of the site and supervising the removal of the drums of hazardous waste squarely fall within CERCLA's definition of response costs, even though the [Government] is not undertaking to do the removal." 759 F.2d at 1043–44. In light of this unequivocal language by the Second Circuit, the Court declines to apply the analysis embodied by *Rohm and Haas. See United States v. Lowe,* 118 F.3d 399, 403 (5th Cir.1997) (also declining to apply *Rohm and Haas* ). Given the undisputed facts in the instant case, *see supra* Part I, and applying applicable Second Circuit law, the Court finds that the EPA's response and oversight costs are recoverable in this action.

3. Defendant Hoffman's Lender Status.

█ Finally, Defendant Hoffman asserts that he should be protected from CERCLA liability because he is merely a lender holding indicia of ownership primarily to protect a security interest. 42 U.S.C. §§ 9601(20)(A), 9607(E)-(G). After reviewing the relevant provisions, the Court finds that this defense is not supported by the statutory definitions and is factually without merit.

Hoffman asserts that he is not an owner of the Inwood Site, and thus not liable, because under Section 101(20)(A) of CERCLA an owner "does not include a person, who, without participating in the management of a vessel or facility, holds

indicia of ownership primarily to protect his security interest." 42 U.S.C. § 9601(20)(A). Furthermore, Hoffman claims that under Section 107(E)-(G) of CERCLA he is a "lender that, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect the security interest of the person in the vessel or facility." 42 U.S.C. 9607(E)-(G).

Despite his assertions to the contrary, Hoffman is not a lender who merely holds indicia of ownership under CERCLA and his interest in 175 Inwood Associates is not a security interest under CERCLA. It is undisputed that Hoffman is a general partner in 175 Inwood Associates, which owned the Inwood Site. *See supra*, Part I. Thus, Hoffman's characterization of himself as merely a lender is unsupported by the facts. Moreover, the Court notes that Hoffman did not assume a general partnership in a limited liability partnership to ensure his security interest. Rather, he became a general partner of a limited liability partnership at the behest of City-trust so as to protect their, not Hoffman's, security interest in the Inwood Site. Thus, it is factually inaccurate for Hoffman to invoke this subsection. Furthermore, the definition of "security interest" embraced by Section 101(20)(G)(vi) of CERCLA includes "a right under a mortgage, deed of trust, assignment, judgment lien, pledge, security agreement, factoring agreement, or lease, and any other right accruing to a person to secure repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person." 42 U.S.C. § 9601(20)(G)(vi). The statutory language set forth above embraces security interests of the type held by Hoffman. For all of these reasons, the Court remains unpersuaded by Hoffman's argument.

## IV. CIVIL PENALTIES

The United States also asks the Court to impose civil penalties on Defendants based on their alleged failure to comply with: (1) an Administrative Order issued by the EPA pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a); (2) an Access Order issued by the EPA pursuant to Sections 104(e)(3) and (e)(5) of CERCLA, 42 U.S.C. § 9604(e)(3) and (e)(5); and (3) multiple Requests for Information issued by the EPA pursuant to Section 104(e)(2) of CERCLA, 42 U.S.C. § 9604(e)(2).

Because the issue of civil penalties was virtually uncontested by Defendants and based upon the undisputed facts, the Court finds that Defendants are liable for civil penalties for their noncompliance with the specific EPA orders listed above and discussed *supra* in Part I. By way of review, the Court notes that the facts set forth above establish that Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates actually did fail to comply with all of the relevant orders and requests in a timely manner. Although the facts indicate that 175 Roger Corporation is not liable under CERCLA for the cleanup costs, that corporation could be liable for civil penalties to the extent that the delays are chargeable to that corporation. However, all of the relevant administrative orders and requests were made prior to June 1993, when 175 Roger Corporation purchased the Inwood Site. Thus, in the absence of any argument or facts to the contrary, the Court finds that 175 Roger Corporation is not liable for civil penalties. Now that a threshold determination of liability has been made, the Court will resolve the issue of penalties when setting the total civil liability.

## V. CONCLUSIONS.

The Court finds that the United States has established Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' liability under Section 107(a) of CERCLA for costs incurred by the EPA in response

to the release or threat of release of hazardous substances at the Inwood Site. Because the Court finds that the entity did not own the Inwood Site at the time of release of some hazardous materials, 175 Roger Corporation is not liable under CERCLA. The United States has also established Defendants Woldiger, Taub, Hoffman and 175 Inwood Associates' liability for civil damages due to their failure to comply with (1) an Administrative Order issued by the EPA pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a); (2) an Access Order issued by the EPA pursuant to Sections 104(e)(3) and (e)(5) of CERCLA, 42 U.S.C. § 9604(e)(3) and (e)(5); and (3) multiple Requests for Information issued by the EPA pursuant to Section 104(e)(2) of CERCLA, 42 U.S.C. § 9604(e)(2). Solely with regard to the amount of damages, interest, fees and costs, the above-captioned action is respectfully REFERRED to United States Magistrate Judge E. Thomas Boyle for a report and recommendation. *See* 28 U.S.C. § 636(b)(3). This report shall address both the costs incurred by the EPA and the civil penalties associated with the relevant administrative orders and requests. IT IS ORDERED that the scope of the foregoing reference shall be deemed to encompass such additional authority as reasonable or necessary to perform the foregoing duties and as is not inconsistent with the Constitution and laws of the United States.

**SO ORDERED.**